# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

### Case No. 13-3379
## FRITZ DAIRY FARM, L.L.C. ET AL.,
Plaintiffs-Appellants

v.

## CHESAPEAKE EXPLORATION, L.L.C., ET AL.,
## KENYON ENERGY & RICHARD OWEN
Defendants-Appellee

# REQUEST FOR RECONSIDERATION AND CLARIFICATION OF SIXTH CIRCUIT JUDGMENT ON JUNE 3, 2014

On Appeal from the United States District Court
for the Northern District of Ohio
in District Court Case No. 5:12-CV-01736

To:
Office of the Clerk
Deborah S. Hunt, Clerk
United States Court of Appeals
for the Sixth Circuit
540 Potter Stewart U.S. Courthouse
100 E. Fifth Street
Cincinnati, Ohio 45202-3988
(513)564-7000

**Plaintiffs Pro Se**
Fritz Dairy Farm, L.L.C.,
  Mark R. Fritz & Michele E. Fritz
6301 Mackel Rd. N.E.
Minerva, Ohio 44657
Telephone: (330)895-2876
Email: fritzdfllc@gmail.com

June 15, 2014

Dear, Your Honors:

For reasons of expense and our requests of certain facts, documents and legal points not being emphasized or explained in sufficient detail in our Appellants' briefs, we have decided to represent ourselves in filing this letter requesting the Court reconsider its June 3, 2014 judgment ('June Judgment') which affirmed US District Court[1] Judge Adam's March 1, 2013 Judgment ['Enforcement Order'- Doc. #26 Pg Id# 236-238; Ex A].[2] We have not discussed this letter with the Mendenhall Law Firm and they have not participated in its contents in any fashion. We have chosen to refer to ourselves as the 'Plaintiffs'.

The Enforcement Order approved the 'Motion to Enforce Judgment' ['Enforcement Motion'-Doc.#20, Page ID #152] filed by the Defendants ['Chesapeake'] which sought approval and enforcement of the Trial Court's Order entered on December 18, 2012' ['Settlement Order' ]. The Settlement Order dismissed our lawsuit *without prejudice*, based upon the terms of the

---

[1] US District Judge for the Northern District of Ohio; presides over our Case No: 5-12-CV-1736. (respectively, "Trial Court" and "Case" or "Lawsuit").

[2] Plaintiffs have attached the following documents to its Exhibit A –Appendix and their docket references: (1)Transcripts of Status Conference /12-17-12]and (2) Enforcement Hearing 2-13-13; (3) Settlement Order of 12-18-2012 dismissing case without prejudice; (4) Enforcement Order 3-1-13; (5) ) Chesapeake Enforcement Motion - 1-15-2013 "Amended Lease and Ratification Agreements "attached as Ex 3 to Chesapeake's Enforcement; (6) "Amended Lease and Ratification Agreements "attached as Ex 3 to Chesapeake's Enforcement; (7) Conveyance (8)Plaintiffs 1-14-2013, letter to the Trial Court; Leiby's 1-2-13 Draft Settlement Document; (10) "Plaintiffs Exhibit 1", e-mail.

settlement reached and placed before the Court ["Settlement Points"] the prior day December 17, 2012 ["Settlement Order"].[3]

We respectively request under FRAP 40 that your Honors reconsider your June Judgment and reverse the Enforcement Judgment for the reasons, among others, that no "meeting of the minds" existed to create a settlement agreement, particularly in that Chesapeake included a "ratification" agreement and related provisions in its Enforcement Motion documents. Among other matters, they required Plaintiffs' to grant new lease rights to two (2) companies not parties to the underlying litigation–Total and Utica' [defined later], and on account of their not being part of the Settlement Points acted as a "rejection" or "counter-offer" to Plaintiffs' settlement offer. Thus, the attempted settlement failed because of Chesapeake's acts.

Alternatively, if this Court is not persuaded by Plaintiffs' arguments that no "meeting of the minds" and no settlement agreement were ever reached, then Plaintiffs request the Court to clarify the meaning and application of your June Judgment in terms of the Settlement Order. That order dismissed the subject Litigation "without prejudice". In order to eliminate another appeal, Plaintiffs' request

---

[3] We respectively refer to them as the "Enforcement Motion" [filed on January 15, 2013]; the "Enforcement Hearing" [conducted on February 13, 2013] and "Enforcement Transcript" [of the Enforcement Hearing]; and the "Status Conference" [conducted on December 17, 2012], "Settlement Order" [entered on December 18, 2012] and "Conference Transcript"[of the Status Conference hearing]. Certain quotations, documents and other matters in our letter are, referenced by Item No. and Page No. in attached Exhibit A, which includes Docket Item and Page Nos. of the Appeal Record.

that this Court clarify that its June Judgment confirms that order's effectiveness, (as being the foundation of the Enforcement Motion and Judgment) since Chesapeake never cross-appealed such orders. With respect to the Settlement Order, did not timely prepare and submit to the Trial Court, for its consideration, a proposed supplemental order, that included "dismissal with prejudice" language. Doc. #19, 12-18-2012, PageID# 151. Plaintiffs' arguments below apply both to the Trial Court and your June Judgment includes abuse of discretion assertions concerning only the Trial Court.

## SUMMARY

The Plaintiffs contend that there was not and could not have been a "meeting of the minds" between Plaintiffs' and Chesapeake with respect to Chesapeake's ("Ratification Agreements") included in its Enforcement Motion, Ex. A, No. 4. Those provisions made material changes to the Settlement Points offered by the Plaintiffs. As a result, the Trial Court erred both as a matter of law, and with respect to its factual findings made in its Enforcement Judgment because the Ratification Agreements and all their ramifications constituted either a rejection or counter-offer to Plaintiffs' Settlement Points. In short, Chesapeake did not "accept" Plaintiffs' offer of settlement.

**I.    Ratification Agreements and Enforcement Motion rejected or represented a counter-offer of Plaintiffs' settlement offer.**

In its Enforcement Motion, Chesapeake points out that under Ohio law, settlement agreement are governed by general principles of contract law.[4] The essential elements of a contract are an offer, acceptance, contractual capacity, consideration, and a manifestation of mutual assent.[5] When Chesapeake drafted settlement amendments of Plaintiffs' leases, it  added [a] "ratification agreements"; [b]  named two companies with whom Plaintiffs had never done business as "lessees" under and party signatories to the Leases; [c]  included ratification provisions which "grant, lease and let" Plaintiffs' lands to those two companies: "TOTAL  E&P USA, Inc." and "CHK UTICA, L.L.C" [respectively, "Total" and "Utica"]; [d] provided that in the event of a conflict between the ratification  terms and the lease provisions, then the ratifications provisions will control; [e] and failed to identify what prior actions of Total and Utica that Chesapeake requires Plaintiffs to ratify. Ohio's Eighth Appellate District Court of Appeals in <u>Wastrel v. Tree</u> <u>Preservation</u> <u>Co.</u>, 2000 Ohio App. LEXIS 1857; 2000 WL 502878 (April 27. 2000) stated the principles of law applicable to this case:

    An acceptance of an ***offer*** forms a binding ***contract*** only if it corresponds to the ***offer*** in every respect. If the offeror must assent to additional terms, as in the instant case, the reply is not acceptance but a ***rejection*** and a counteroffer. *Foster v. Ohio State Univ. (1987), 41 Ohio App. 3d 86, 88, 534 N.E.2d 1220.*

---

[4] Spercel v. Sterling Industries, Inc. 31 Ohio St. 2d 36,40 (1972)

[5] Kostelnik v. Helper, 96 Ohio St. 3d 1, 770 N.E.2d 58, 2002 (Ohio 2002), which confirmed accepted legal practice that stated: "Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration."

Your Honors will readily ascertain that nowhere in the Status Conference Transcript, the Enforcement Hearing Transcript or the terms of settlement announced by Leiby to the Trial Court on December 17, 2012 is any mention or reference to Total or Utica, "ratification" agreements or provisions, nor the claim that Plaintiffs must sign and be bound by a settlement document that "grants new lease rights to third parties who are not even a party to the Litigation.[6]

## Lease Granting Rights:

"**Lessor** ratifies …… and **does hereby grant, lease and let** the Leased Premises **unto Lessee** …… and hereby agrees and acknowledges  that said Lease is valid and shall remain in full force and effect according to the terms and provisions hereof. "….

## Ratification Rights Control Lease Provisions:

"If any of the above stated provisions in this Amendment conflict with the printed provisions or terms of the Lease, the above stated provisions in this Amendment shall control."

What Plaintiffs know quite clearly is that they never included such ratifications as part of their settlement offer and they never agreed to such ratification provisions, including their granting new lease rights to two companies

---

[6] Chesapeake's *proposed* Ratification Agreement includes Total and Utica as named "lease signees 'to the settlement documents. [Document #20-3, filed 01-15-2013, page 2-16, PageID #186-200.]  The Appellate Record clearly shows that neither Total nor Utica are parties to this Litigation.

not a party to this litigation. Throughout January, 2013, Chesapeake's attorneys and Leiby emailed drafts of documents to each other, almost daily. The attorneys never reached closure on them. On January 15, 2013, Chesapeake filed its Enforcement Motion and sought the Trial Court's approval of these ratification provisions, as its Exhibit 3, [Docket #20]

Chesapeake's seeking approval of those provisions constituted an open-court rejection of Plaintiffs' settlement offer. Alternatively, and at a bare minimum, Chesapeake's actions represented a counter-offer to Plaintiffs' December 17, 2012 settlement offer—which Plaintiffs' in return rejected. And contrary to Chesapeake's Reply Brief, it is Chesapeake, not the Plaintiffs, which has "buyer's remorse": Plaintiffs made a settlement offer involving three lease amendments. When Chesapeake decided to add ratifications and third parties to the lease amendments it rejected Plaintiffs' settlement offer.

Clearly, the Enforcement Motion and Exhibit 3 demonstrated there was no "meeting of the minds" between the parties over the settlement points announced at the Status Conference. Even more, Plaintiffs suggest that Chesapeake or its attorneys may have engaged in a knowing sleight of hand by not notifying and obtaining both the Trial Court's approval and our agreement to add Total and Utica as new parties to the case and then as new "lessees" as well under its ratification provisions' counter-offer:

"MCGRANOR: "Our position, your Honor, is that a settlement – a binding settlement was reached, was read into the record before this court. *The terms were* <u>clear.</u> The terms included all of the things **that we have in the documents** *without change.* "[Lines 4-8]

"COURT:    Counsel for the movement, [sic] do you have any other evidence you wish to present at this time.

MCGRANOR:        We do not, your Honor. We think that the transcript that we read into the record, the *transcript that encapsulates the settlement terms is very clear*. It incorporates the terms exactly as we've set them forth in our motion and we believe that is appropriate for this court to order the Fritzes to comply with those terms, **including signing of the** lease amendment and **ratifications that encapsulate the terms they agreed** to so we can pay them the settlement amount that we agreed to and we can all go on with our lives."

Plaintiffs say no more.

## II.    Ohio Statute of Frauds Require Written Documents For Amendments to Oil and Gas Leases,

The Ohio Supreme Court stated in *Harris v. Ohio Oil Co (1887)*, 57 Ohio St. 118, 129; 48 N.E. 502, *that:    "The rights and remedies of the parties to all oil and gas must be determined by the terms of the written document..... Such leases are contracts, and the terms of the contract with the law applicable to such terms must govern the rights and remedies of the parties."*

Following the Court's rationale, Ohio has since then enacted Statute of Frauds provisions specifically applicable to oil and gas leases. ORC 5301.01 etc. recognizes and treats oil and gas leases as real property; and requires leases, any amendments, conveyances, mortgages or interest in them, be in writing, executed, properly acknowledged and recorded in the county of the underlying lands' location. ORC 5301.09 [7]also requires that any contracts involving the drilling or operating of oil and gas wells must be recorded immediately after execution.

---

[7] In important part, ORC 5301.09 states: " All *Leases*, licenses and assignments thereof, or *any interest* therein, concerning lands  tenements in this state, by which *any right* is *granted to **operate*** or to sink or drill wells thereon for natural gas and petroleum or either, or *pertaining thereto*, *shall be filed* for record and ***recorded*** in such lease *records **without delay.**"

Ohio has also enacted certain provisions to protect owner's interests in lands and leases against disputes caused by differing oral agreements, ORC 5301.332[8]. It has established requirements for how and under what circumstances one person can be authorized to act for another who owns real property, oil and gas leases or interests affected by oil and gas leases.  For instance, ORC 1337.04 [9] requires a Power of Attorney be executed and recorded by a property owner who wishes to create in another party's name[10], the power and authority of the property's owner to deal with its property interests. That written power of attorney or its equivalent must be  recorded before the holder attempts to exercise rights concerning the real

---

[8] ORC 5301.332 gives landowners ability to clear their titles from non-producing leases or expired leases and terminating leases for lessees, successors or assigns, not abiding by certain covenants, under terms of leases.

[9] ORC §1337.04 which requires a power of attorney "for the lease of real property" to be recorded ....in the county in which such property is situated, *previous* to the recording ... of the lease... by virtue of such power of attorney." The Ohio Supreme Court in the case of *The Lit graph Building Co. v. Watt*, 96 Ohio St.74, 177 NE 25 [1917] ruled that a *"power of attorney to authorize the execution of a lease of any estate or interest in real property* for a period of five years is required to be acknowledged **by the principal** and under the provisions of R.C. 1337.04 it is required to be recorded.

[10] In the case of  Master Consol. Corp. v. Banc Ohio Nat'l Bank, 61 Ohio St. 3d 570, 575 N.E.2d 817, 1991 Ohio LEXIS 2119 (Ohio 1991) the Ohio Supreme Court stated:

" Thus, in order for a principal to be bound by the acts of his agent under the theory of apparent agency, evidence must affirmatively show:  (1) that the principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority, and (2) that the person dealing with the agent knew of the facts and acting in good faith had reason to believe and did believe that the agent possessed the necessary authority. **The apparent power of an agent is to be determined by the act of the principal and not by the acts of the agent**; a principal is responsible for the acts of an agent within his apparent authority only where the principal himself by his acts or conduct has clothed the agent with the appearance of the authority and not where the  agent's own conduct has created the apparent authority.'"; Blackwell v. Internal. Union, U.A.W. (1983), 9 Ohio App.3d 179, 9 OBR 289, 458 N.E.2dLogsdon v. ABCO Constr. Co. (1956), 103 Ohio App. 233, 241-242, 3 O.O.2d 289, 293, 141 N.E.2d 216, 223; Ammerman v. Avis Rent A Car System, Inc. (1982), 7 Ohio App.3d 338, 7 OBR 436, 455 N.E.2d 1041 1272. 5"

property—whether it involve assignments, mortgages, leases, amendments, or other substantive matters involving interests in oil and gas leases .

Given the above statutes, precedent, and the fact that oil and gas leases by their nature are extremely varied and complicated, the Trial court erred in determining that a final settlement of the Litigation existed as of December 17, 2012, when settlement documents seeking to amend the term length and other substantive rights under the Plaintiffs' leases had not been drafted, negotiated or agreed upon by all parties. The Trial Court failed to abide Ohio's laws which provide special treatment to oil and gas leases, especially in requiring written documents in a recordable form be agreed upon.

The oral announcements of lease amendments set forth in two or three brief phrases or sentences at the Status Conference failed to achieve the definitive and specific level of understanding and enforceability required by Ohio Statute of Fraud laws. For example, the Settlement Points failed to identify which lease paragraph provisions would be amended; what specific language would accomplish those amendments; what differing interpretations, applications or other considerations needed to be negotiated, resolved and written before the verbal announcements resulted in a final, enforceable settlement agreed to by all parties.

Ohio's Statutes of Fraud laws' application simply required the Trial Court treat the December 17th announcements as the parties having reached a preliminary

settlement which would become a Final Settlement once the settlement documents involving lease amendments had been drafted, negotiated and agreed upon by the parties. Upon that development, the parties would submit the settlement documents for the Trial Court's approval. The Ohio Supreme Court has for a very long time recognized that oil and gas leases typically have different and complicating provisions from one to the next. Consequently, litigation of them requires a heightened level of specificity, process and approval.

The Trial Court's process and procedure for settling this Litigation violated the design, intent and principles of Ohio's Statute of Frauds and its Power of Attorney/Agency pre-requisites for establishing a party's "full" authority" for litigation involving oil and gas leases.  The two step process represents a more economic use of the courts' time since its application would eliminate unnecessary disagreement, and in this case would have eliminated both, this appeal, the Enforcement Hearing and the associated the expense and time involved.

After lunch that day, The Trial Court offered – or directed - the Plaintiffs leave the court for their farm, without quizzing them in the least about the settlement points or extent of Leiby's authorization. Doc. #37, Page 38 or PageID #509    Thus, the Trial Court reliance upon its normal procedure for substantiating its entering the Settlement Order was misplaced.  The Trial Court was mistaken. Normally, not an issue, but here, that failure undercut the Settlement Order.  The

Court's secondary reason was Leiby's own statements that he had Plaintiffs' full and complete authority to settle the Litigation.    However, the importance of his statements must be realty minimized for several reasons:  Under Ohio law, that foundational grant of authority  must originate from the Plaintiffs -- as "principal[1] – and not  their attorney agent, to whom the Trial Court previously  heeded little attention or belief. In the morning portion of the Status Conference, the Trial Court disputed Leiby's representation of fact that Mark. Fritz would not have signed a lease with a renewal clause in it.

So, the Trial Court actually took two different views of Leiby's statements as an "officer of the court" in the same hearing. In the morning the Court disputed Leiby's statements; in the afternoon it exclaimed and relied upon them. The Trial Court 's reliance on Leiby's  having "full and complete" authority to from the Plaintiffs' to settle  the litigation- with  no  apparent  boundary  or  limitation whatsoever- on the basis of his being an "officer of the court" but having only represented the Plaintiffs for less than a day is unrealistic and implausible.    Other events at the Status Conference disavowed that conclusion, including Plaintiffs' observations set out in **Exhibit A**.

III.    **Plaintiffs' Material Disagreements over Settlement Documents.**

The Trial Court's Enforcement Order erred as a matter of law because the

Plaintiffs had material disagreements with the contents of the draft Settlement Documents which were never finalized and agreed upon even by counsel. In its Enforcement Motion, Chesapeake attached only two (2) documents: (1) Cash Receipt and (2) Lease Amendment and Ratifications Agreements.

Those disagreements included the following, two of which violated applicable Ohio law:

[A & B]: "Sealed Record & Confidentiality Agreement: Plaintiffs objected to the Trial Court's sua sponte "sealing" of the record in the case and calling for a "confidentiality agreement" in the settlement documents, because neither Chesapeake nor the Trial Court provided substantive reasons for either actions as required by the Ohio Public Access to Records Act–ORC 149.43 and Ohio Supreme Court Rule 45[12]; denied Plaintiffs' rights to free speech concerning the Leases with neighbors and others with similar experiences; and prevented Plaintiffs from determining whether Brendan Delay violated Ohio Professional Attorney Conduct Rules in his failed representation of their interests in the case.

[C & D]: Compelled Execution of Non-Identified Settlement Documents; and Execution of Ratification Agreements Not Part of Plaintiffs' Settlement Offer. The

---

[12] Ohio Public Records Act, ORC 149.43 and Ohio Supreme Court Rule 45 which gives the public, including its citizens, the right to access public documents, including court records, In fact, SC R45A creates a presumption of public access and in many instances requires clear and convincing evidence why that general rule should not be followed. State ex rel. Vindicator Printing Co. v. Wolff, 132 Ohio St. 3d 481, 2012-Ohio-3328, 974 N.E.2d 89, 2012 Ohio LEXIS 1822, 40 Media L. Rep. 2641, 2012 WL 3031255 (Ohio 2012)

Trial Court's Enforcement Order erred in ordering Plaintiffs to execute and be bound by un-identified "settlement documents", on the one hand, and to execute and be bound by Ratifications Agreements which terms and parties [Total and Utica] were never part of the Settlement Points.

[E]: Compelled Execution of Disputed Amendment to Lease Term Limitations

Given Plaintiffs' executed its oil and gas leases on July 27, 2010, approximately 2⅓ years of the leases' stated term had expired at the time of the Status Conference held on December 17, 2012. Under the Plaintiffs' Original Leases (in their lock boxes) if Chesapeake did not drill a well on their property within five (5) years after their execution, or next summer's July 27, 2015, the leases would expire. Under the Recorded (Fraudulent) Leases, (so claimed in Plaintiffs' lawsuit), if Chesapeake failed to drill a well on Plaintiffs' lands by July 27, 2015, the leases would also expire unless Chesapeake accepted an option to extend the lease term for five more years by paying Plaintiffs an option bonus of $97,660. Bonus checks issued by Chesapeake were paid to the Plaintiffs and delivered by Richard Owen of Kenyon Energy, in August 2010. Under the applicable Settlement Point, Plaintiffs agreed to shorten the recorded extension term by the maximum possible length of lease time remaining without its expiration due to the non-drilling of well on its lands to 7.5 years. Plaintiffs achieved certainty of the 7.5 year term and avoided Chesapeake's possible claims that its time in litigation would not extend the term.

To insure against any related or dissimilar claims, Plaintiffs demanded that Chesapeake have no right to extend the lease beyond the 7.5 year maximum period.

In drafting the Lease Amendment, Chesapeake was not satisfied. It sought to profit by re-interpreting that Settlement Point. So, instead of "shortening" the ENTIRE lease term to 7.5 years, it sought to eliminate the 5-year Primary Term and obligation to either drill a well or pay Plaintiffs' option bonus of $97,660. Plaintiffs disagreed with that interpretation because its Settlement Point did not use the phrase "shorten the extension option from 5-years by 2½-years, to an entire term of 7½-years total", from the recorded lease" or "eliminate the renewal option".

On account of these additional grounds, the Trial Court erred in determining that Plaintiffs did not have legitimate reasons for objecting to the settlement documents.

We respectively respect the Court to reverse the Trial Court's Enforcement Order or enter a judgment clarifying an affirming Chesapeake to be bound by the present terms of the Settlement Order due to its failure to cross-appeal the Enforcement Order and its failure to tender any proposed order and all settlement documents within thirty days of December 18, 2012.

June 17, 2014

## CERTIFICATE OF SERVICE

We certify that we have sent a Copy of this Letter with its Request for Clarification and Reconsideration by overnight mail delivery to:

[1]Attorneys for Appellees:  John Keller, 0019957
            Tim McGranor, 0072365
            c/o The Law Offices of Vorys, Sater, Seymor & Pease, LLP,
            52 E. Gay St., P.O. Box 1008
            Columbus, OH 43216-1008
             Fax 614-464-6389

[2] Former Attorneys *in this Appeal for* Plaintiffs/Appellants
            Warner Mendenhall, 0070165
            Alyssa Allen, 008271
            c/o Warner Mendenhall, Inc.
            190 N. Union St., Suite 201
            Akron, OH 44304
            330-535-9160
            330-762-9743.
      Plaintiffs have released their Attorneys from this Appeal

SINCERELY YOURS,

MARK R. AND MICHELE E. FRITZ
6301 MACKEL RD.N.E.
MINERVA, OHIO 44657
(330)895-2876
E-MAIL: fritzdfllc@gmail.com

# ITEM 3

## DOC. #19  SETTLEMENT ORDER

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

Fritz Dairy Farm, LLC, et al.,                    )        CASE NO.: 5:12CV1736
                                                  )
                                                  )
        Plaintiffs,                               )        JUDGE JOHN ADAMS
                                                  )
v.                                                )        **ORDER**
                                                  )
Chesapeake Exploration, LLC, et al.,              )
                                                  )
        Defendants.                               )

The parties appeared before the Court for a status conference on December 17, 2012. During the conference, the parties settled and placed the terms of their settlement before the Court. Therefore, the docket will be marked "settled and dismissed without prejudice." The parties may submit within thirty (30) days a proposed entry setting forth different terms and conditions relative to the settlement and dismissal of this case, including dismissal with prejudice, if they deem it necessary. If approved, the proposed entry shall supplement this order. This Court retains jurisdiction over the settlement.

        IT IS SO ORDERED.

Dated: December 18, 2012                    _____/s/ Judge John R. Adams_____
                                           JUDGE JOHN R. ADAMS
                                           UNITED STATES DISTRICT COURT

1

# INDEX 4

## DOC #26  ENFORCEMENT HEARING ORDER

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

Fritz Dairy Farm, LLC, et al.,                    )        CASE NO.: 5:12CV1736
                                                  )
            Plaintiffs,                           )        JUDGE JOHN ADAMS
                                                  )
                                                  )
                                                  )
Chesapeake Exploration, LLC, et al.,              )
                                                  )        **ORDER**
            Defendants.                           )
                                                  )

Pending before the Court is a motion to enforce settlement filed by Defendants.  Plaintiffs opposed the motion, and the Court conducted an evidentiary hearing on February 13, 2013.  The motion to enforce is GRANTED.  This order is placed under seal due to the parties' agreement regarding the confidentiality of the terms of their settlement.

In their motion, Defendants seek to enforce the settlement agreement reached during a conference before this Court on December 17, 2012.  In response, Plaintiffs contend that this Court lacks jurisdiction over the entirety of this matter and that no agreement was ever reached by the parties.

Initially, the Court would note that jurisdiction has been established in this Court. Plaintiffs' contentions regarding Defendant Owen focus upon his notary application form with the state of Ohio.  Regardless of whether or not Owen placed false statements on that form, his sworn affidavit before this Court establishes that he is not a resident of Ohio.  Accordingly, diversity jurisdiction was properly invoked when Defendants removed this matter.

Next, Plaintiffs assert that the parties never reached an agreement.  Specifically, Plaintiffs

contend that their counsel was not authorized to agree to the terms offered by Defendants.  In that regard, the Court notes as follows.  First, Mr. and Mrs. Fritz were present at the outset of the Court's status conference on December 17, 2012.  As the matter proceeded, the Court released them from their obligation to be present to facilitate their return to the family farm, only after they expressed the need to care for their dairy cows.  At the time of their release, all parties were negotiating a possible settlement.  The Court specifically discussed that matter with the Fritzes and told them to be certain that their attorney could continue negotiations.  They assured the Court that this was the case and left the status conference.

After the Fritzes left the conference, negotiations continued and a settlement was ultimately reached.  The Court then required the parties to place the terms of the settlement on the record before the Court.  The Fritz's counsel, Attorney Leiby, then recited the terms of the parties' agreement as follows:

> Yes, we've agreed modification of the lease from a five-year lease with a five-year renewal term -- the recorded lease to a lease of an entire term of seven and a half years with no right of renewal.
>
> The payment by the defendants to the plaintiffs of $10,000.
>
> The further modification of the recorded lease to provide for reclamation of the land upon termination of the lease, as well as to provide additional protections for the water supply on the property.

The Court then asked the following:

> I know I've allowed your clients to leave given the nature of their occupation. You have represented to the court you have full and complete settlement authority, and you've conferred with your clients and they agreed to the settlement?

Attorney Leiby responded:  "I've conferred with my clients. They've agreed with the settlement."

The Court then inquired about whether confidentiality would be an issue in the agreement.

Counsel for Defendants indicated that the amount of the settlement would need to remain

confidential and Attorney Leiby responded that he had no objection to this term.

During the Court's hearing, Attorney Leiby conceded that he had not, prior to the Court's question, informed the Fritzes about the issue of confidentiality. The Fritzes seize upon this admission and contend that this is a material term and that this concession demonstrates that they never agreed to such a term. However, that is not the evidence before the Court. Rather, the evidence is that an officer of the Court, Attorney Leiby, represented that he had *full* authority to settle the matter on behalf of his clients. Whether a specific term was relayed to the Fritzes before or after the Court put the terms on the record is immaterial to whether Attorney Leiby had the authority he represented to the Court.

In that regard, the Court heard testimony from Mrs. Fritz and Attorney Leiby. The two have wildly different recollections of Attorney Leiby's representation and his scope of authority. Having had the opportunity to observe both as witnesses and Mrs. Fritz throughout the proceedings in this matter, the Court finds Attorney Leiby to be more credible. Accordingly, the Court will rely upon his statements in open court that he had the full authority to enter into the settlement under the terms stated in open court.

Accordingly, the motion to enforce is GRANTED. Plaintiffs shall immediately take all steps necessary to execute the settlement documents and comply with their terms.


IT IS SO ORDERED.


March 1, 2013                                     /s/ John R Adams
                                                 JUDGE JOHN R. ADAMS
                                                 UNITED STATES DISTRICT JUDGE

# INDEX 5

## DOC #20   ENFORCEMENT MOTION

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| FRITZ DAIRY FARMS, L.L.C., et al., | ) | Case No. 5:12-cv-1736-JRA |
| | ) | |
| Plaintiffs, | ) | Judge John R. Adams |
| | ) | |
| v. | ) | |
| | ) | |
| CHESAPEAKE EXPLORATION, L.L.C., et al., | ) | **DEFENDANTS' MOTION TO ENFORCE SETTLEMENT** |
| | ) | |
| Defendants. | ) | |

Defendants Chesapeake Exploration, L.L.C., Richard Owen, and Kenyon Energy, LLC, respectfully request an order from the Court compelling Plaintiffs Fritz Dairy Farms, L.L.C., Mark R. Fritz, and Michele E. Fritz to comply with the terms of the settlement that was reached and placed on the record before this Court on December 17, 2012, and to order that they sign the documents necessary to effectuate the settlement terms. The reasons supporting this motion are set forth in the attached memorandum in support.

Respectfully submitted,

*/s/ Timothy B. McGranor*
John K. Keller (0019957)
Timothy B. McGranor (0072365)
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
Columbus, OH 43215
(614) 464-6400 / Fax: (614) 719-4954
E-mail:  jkkeller@vorys.com
        tbmcgranor@vorys.com

*Attorneys for Defendants Chesapeake Exploration, L.L.C., Richard Owen, and Kenyon Energy, LLC*

# MEMORANDUM IN SUPPORT

## I.    INTRODUCTION

The parties settled this action on December 17, 2012, after several hours of negotiations that took place during the status conference scheduled for that date.  The terms of the settlement were read into the record, and the parties' counsel confirmed to the Court that their respective clients agreed to the material terms.  Plaintiffs (apparently acting without the advice or knowledge of their counsel) have now refused to proceed with the settlement, the terms of which require them to execute lease amendments to be recorded in Carroll County, Ohio.  Because Plaintiffs are refusing to comply with the settlement terms, Defendants request an order enforcing the settlement and compelling them to execute the necessary documents.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs filed this action in June 2012, claiming that the oil and gas leases recorded with the Carroll County, Ohio, Recorder's office were void as a result of alleged fraudulent alteration to the terms of the documents.  Specifically, Plaintiffs claim that the five-year extension provision in the recorded lease should have been stricken from the recorded lease before filing.

Following discovery, the parties appeared before the Court on December 17, 2012, for the previously scheduled status conference.  At the status conference, Plaintiffs' current counsel, Steve Leiby, announced that prior counsel Brendan Delay had been terminated by Plaintiffs.  Pursuant to the Court's instructions, the parties negotiated toward a potential settlement for several hours that day.  Finally, the parties reached a compromise settlement.  The terms of that settlement were read into the sealed record before the Court.

The salient terms of that settlement are:

- Plaintiffs will be paid a sum of money (the amount of which is confidential, as discussed on the record).
- The lease will be amended to provide for a straight 7.5-year term from the original execution date, instead of the 5-year lease with a 5-year extension option that is in the recorded lease and disputed by Plaintiffs.
- The lease will be amended to provide for additional water protection and reclamation clauses requested by Plaintiffs.

In exchange for these terms, Plaintiffs agreed to release their claims and dismiss the action, with prejudice.

In response the Court's inquiry, Plaintiffs' counsel stated that he could provide the proposed settlement agreement within 30 days. Defendants' counsel stated that he would prepare the documents necessary to modify the leases. Those documents were, in fact, prepared by the respective counsel. Plaintiffs' counsel sent the proposed settlement agreement to Defendants' counsel on January 2, 2012, by e-mail. Following discussions about the terms, Plaintiffs' counsel sent a revised agreement on January 9. Defendants' counsel sent the proposed lease ratification and amendment to Plaintiffs' counsel on January 2, 2012. Following some discussion about the language in the proposed lease amendment, Defendants' counsel provided revised documents to Plaintiffs' counsel on January 14, 2012.[1] Earlier today, the parties' counsel agreed

---

[1] Because of the agreement for confidentiality, the draft settlement agreement itself is not attached, but can be provided for *in camera* review at the Court's request. The e-mail exchanges between counsel, however, are attached as Exhibit 1.

on the terms of these lease modifications. (*See* e-mail exchange attached as Exhibit 2.) Copies

of the proposed lease ratifications and amendments are attached as Exhibit 3.

Defendants' counsel received a cryptic e-mail from Plaintiffs' counsel yesterday morning,

however, which reads:

Tim,

As of 11:55 AM today, I do not have any commitment from my clients regarding
the terms of the settlement agreement or the lease amendment and ratification. At
this point my hands are tied. I will inform you the minute I receive, if I do, a
definitive commitment from my clients.

Steve

(*See* Exhibit 4, attached.)

Then, Defendants' counsel received this morning a 14-page statement from Plaintiffs,

apparently sent without the knowledge of their counsel. A copy of this statement is attached as

Exhibit 5. The statement purports to also have been sent to the Court, with copies to Plaintiffs'

current and former attorneys.

From the statement, it appears that Plaintiffs are refusing to sign the necessary documents

to conclude the settlement. (*See* Ex. 5 at 14.) As discussed below, the settlement is binding and

enforceable, and Defendants request an order compelling Plaintiffs to execute the necessary

documents to effectuate the settlement.

## III.   LAW AND ARGUMENT

There can be no real dispute that the parties settled this action on the record on December

17, 2012. That settlement included the material terms set forth above. That settlement is binding

and enforceable. This Court's order after the status conference confirms the existence of the

settlement, stating in pertinent part:

The parties appeared before the Court for a status conference on December 17, 2012. ***During the conference, the parties settled and placed the terms of their settlement before the Court.*** Therefore, the docket will be marked "settled and dismissed without prejudice."

(ECF No. 19 (emphasis added).)   This Court specifically "retain[ed] jurisdiction over the settlement." (*Id.*)

To enforce a settlement, the court must first conclude that the parties have reached an agreement on all material settlement terms. *See Re/Max Int'l, Inc. v. Realty One, Inc.*, 271 F.3d 633, 645–46 (6th Cir. 2001). This occurred here when the parties placed on the record the terms of the settlement, specifically, payment of a sum to Plaintiffs, modification of the lease to a 7.5-year primary term instead of a 5-year term with a 5-year extension, and modification of the leases to add additional water-quality testing and reclamation provisions favorable to Plaintiffs, in exchange for a release of Plaintiffs' claims. Those terms are clear, unambiguous, and constitute an enforceable settlement of this action. *Id.*; *see also Smith v. ABN AMRO Mortg. Grp., Inc.*, 434 F. App'x 454 (6th Cir. 2011).

It is immaterial whether the settlement has yet been memorialized in writing. *Id.* The terms were agreed to on the record. But the parties' counsel have even agreed upon the written terms of the settlement (including a settlement agreement and the terms of the lease ratifications and amendments), but Plaintiffs are refusing to sign the documents that are required to memorialize the modifications of the leases at the Recorder's office.

Settlement agreements are favored under the law. *See Walther v. Walther*, 102 Ohio App. 3d 378, 383 (1995). A court retains the inherent authority to enforce agreements entered into in settlement of litigation pending before them. *See Bamerilease Capital Corp. v. Nearburg*, 958 F.2d 150, 152 (6th Cir. 1992); *Chao v. Am. Nat'l Fleet Servs., Inc.*, 2008 U.S. Dist. LEXIS 51244, *3 (N.D. Ohio July 3, 2008). As settlement agreements are contracts, determining

whether a settlement agreement is valid and enforceable is a matter of state substantive law. *See Smith*, 434 F. App'x at 460; *Bamerilease Capital Corp.*, 958 F.2d at 152; *Chao*, 2008 U.S. Dist. LEXIS 51244, *4; *Echols v. Williams*, 267 F. Supp. 2d 865, 867 (S.D. Ohio 2003).

Under Ohio law, settlement agreements are governed by general principles of contract law. *See Spercel v. Sterling Industries, Inc.*, 31 Ohio St.2d 36, 40 (1972). Ohio courts will enforce an oral settlement agreement when the negotiations reach a point in which the terms are reasonably certain and mutual assent to settle has been expressed. *See Kostelnik v. Helper*, 96 Ohio St. 3d 1, 3–4 (2002). In fact, an oral settlement agreement entered into *in the presence of the court* constitutes a binding settlement contract. *Spercel*, 31 Ohio St. 2d at paragraph one of the syllabus; *see also Mack v. Polson Rubber Co.*, 14 Ohio St. 3d 34, 37 (1984); *Eckstein v. Eckstein*, No. CA2010-10-097, 2011-Ohio-1724, ¶ 13 (Ohio Ct. App. April 11, 2011); *Bolen v. Young*, 8 Ohio App. 3d 36, 37 (1982). Moreover, when the parties have agreed on the essential terms of a settlement, and all that remains is to memorialize the agreement in writing, the parties are bound by the terms of the oral agreement. *Smith*, 2011 U.S. App. LEXIS 15866, *16.

The elements of a binding settlement agreement are met here. As in *Smith*, there was "a meeting of the minds as well as an offer and acceptance," 434 F. App'x at 460 (citation omitted), that were fully set forth in the settlement terms read into the record on December 17. The parties agreed to the material terms, there was consideration, and they entered into a binding contract to settle this action. Plaintiffs should be required to fulfill their settlement obligations by executing the documents necessary to conclude the settlement.

## IV.   CONCLUSION

The Parties entered into a binding settlement agreement on December 17, 2012, and Plaintiffs are bound by that agreement. Thus, Defendants request an order enforcing the

settlement and specifically ordering Plaintiffs to execute the settlement documents as agreed upon by counsel.

Respectfully submitted,

/s/ Timothy B. McGranor
John K. Keller (0019957)
Timothy B. McGranor (0072365)
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
Columbus, OH 43215
(614) 464-6400 / Fax: (614) 719-4954
E-mail:   jkkeller@vorys.com
              tbmcgranor@vorys.com

*Attorneys for Defendants Chesapeake
Exploration, L.L.C., Richard Owen, and
Kenyon Energy, LLC*

- 7 -

## CERTIFICATE OF SERVICE

I certify that on this 15th day of January 2013, a copy of the foregoing *Defendants'*

*Motion to Enforce Settlement* was served by the Court's CM/ECF system on the following:

    Stephen P. Leiby
    Leiby Hanna Rasnick, Towne, Evanchan,
      Palmisano & Hobson, LLC
    388 South Main Street, Suite 402
    Akron, OH 44311

    *Attorney for Plaintiffs*

and by regular US mail on the following:

    Mark R. Fritz
    Michele E. Fritz
    6301 Mackel Rd., N.E.
    Minerva, OH 44657

    *Plaintiffs*

                  /s/ *Timothy B. McGranor*
                  Timothy B. McGranor (0072365)

**McGranor, Timothy B.**

| | |
|---|---|
| **From:** | Stephen P. Leiby [sleiby@neolaw.biz] |
| **Sent:** | Wednesday, January 02, 2013 5:33 PM |
| **To:** | Keller, John K.; McGranor, Timothy B. |
| **Subject:** | Fritz Dairy Farm, L.L.C. et al. v. Chesapeake Exploration, L.L.C. |
| **Attachments:** | Settlement Agreement & Release.pdf |

NOTE: THE INFORMATION CONTAINED IN THIS E-MAIL IS PRIVILEGED AND CONFIDENTIAL AND SOLELY FOR THE USE OF THE INTENDED RECIPIENT.  IF YOU ARE NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY REVIEW, DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS E-MAIL IS STRICTLY PROHIBITED.  IF YOU HAVE RECEIVED THIS E-MAIL BY MISTAKE, IMMEDIATELY DELETE IT AND ALL COPIES AND SEND A REPLY OR CALL 330-253-2227 (YOU MAY CALL COLLECT) TO NOTIFY THE SENDER OF THE MISTAKEN TRANSMISSION.

Gentlemen,

Attached, for your review and comment, is a draft of a Settlement Agreement and Release in the captioned case.  My clients have not seen or read the attached Agreement and its terms are, therefore, subject to their approval.

Please provide me with a copy of the amendment to each of the subject leases at your early convenience.

Steve

STEPHEN P. LEIBY
LEIBY HANNA RASNICK
Towne, Evanchan, Palmisano & Hobson, LLC
388 South Main Street, Suite 402
Akron, Ohio 44311
TEL: 330-253-2227
FAX: 330-253-1261

1

## McGranor, Timothy B.

**From:** McGranor, Timothy B.
**Sent:** Wednesday, January 02, 2013 5:52 PM
**To:** 'Stephen P. Leiby'
**Subject:** RE: Fritz Dairy Farm, L.L.C. et al. v. Chesapeake Exploration, L.L.C.
**Attachments:** 34387.0.CAR_(UTICA_PARTIAL_OWNER_MOD)_Fritz_Mark_R._JSWEITZER-2.pdf;
73391.0.MAS_(UTICA_MODIFICATION_FORM)_CARTER_CHARLES__JSWEITZER-2.pdf

Steve:

Thank you. I'll review and let you know my thoughts. Two things jump out immediately:

(1) Chesapeake has standard language it uses for the water-protection and reclamation items that we've agreed on. That language is included in the attached proposed draft lease amendments. Please take a look and let me know whether that is acceptable. If so, we can either include that language in the settlement agreement, or simply attach these as exhibits to the agreement.

(2) I didn't see a paragraph calling for dismissal with prejudice.

I'll review in more detail and speak with my clients and let you know if I have any additional comments.

-Tim

**From:** Stephen P. Leiby [mailto:sleiby@neolaw.biz]
**Sent:** Wednesday, January 02, 2013 5:33 PM
**To:** Keller, John K.; McGranor, Timothy B.
**Subject:** Fritz Dairy Farm, L.L.C. et al. v. Chesapeake Exploration, L.L.C.

**NOTE: THE INFORMATION CONTAINED IN THIS E-MAIL IS PRIVILEGED AND CONFIDENTIAL AND SOLELY FOR THE USE OF THE INTENDED RECIPIENT. IF YOU ARE NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY REVIEW, DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS E-MAIL IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS E-MAIL BY MISTAKE, IMMEDIATELY DELETE IT AND ALL COPIES AND SEND A REPLY OR CALL 330-253-2227 (YOU MAY CALL COLLECT) TO NOTIFY THE SENDER OF THE MISTAKEN TRANSMISSION.**

Gentlemen,

Attached, for your review and comment, is a draft of a Settlement Agreement and Release in the captioned case. My clients have not seen or read the attached Agreement and its terms are, therefore, subject to their approval.

Please provide me with a copy of the amendment to each of the subject leases at your early convenience.

Steve

STEPHEN P. LEIBY
LEIBY HANNA RASNICK
Towne, Evanchan, Palmisano & Hobson, LLC
388 South Main Street, Suite 402
Akron, Ohio 44311
TEL: 330-253-2227
FAX: 330-253-1261

1

**McGranor, Timothy B.**

| | |
|---|---|
| **From:** | Stephen P. Leiby [sleiby@neolaw.biz] |
| **Sent:** | Wednesday, January 09, 2013 3:56 PM |
| **To:** | McGranor, Timothy B. |
| **Subject:** | RE: Fritz Dairy Farm, L.L.C. et al. v. Chesapeake Exploration, L.L.C. |
| **Attachments:** | Settlement Agreement & Release (rev).doc |

**NOTE: THE INFORMATION CONTAINED IN THIS E-MAIL IS PRIVILEGED AND CONFIDENTIAL AND SOLELY FOR THE USE OF THE INTENDED RECIPIENT. IF YOU ARE NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY REVIEW, DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS E-MAIL IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS E-MAIL BY MISTAKE, IMMEDIATELY DELETE IT AND ALL COPIES AND SEND A REPLY OR CALL 330-253-2227 (YOU MAY CALL COLLECT) TO NOTIFY THE SENDER OF THE MISTAKEN TRANSMISSION.**

Tim,

I have talked with Mrs. Fritz and reminded her of the deadline. I have also sent a follow up letter to them.

In an effort to try to keep this moving, attached please find a revised settlement agreement in which I have attempted to take into account your comments and requests.

Regarding the Amendments and Ratifications I have the following observations and requests.

1. CHK Utica, L.L.C. and TOTAL E&P USA, INC. have been added. Have the leases been assigned in part or in whole to them? If so, please provide to me a copy of the assignment(s)?

2. The Amendments and Ratifications refer to Exhibit A. I discovered that I do not have that Exhibit. Please provide a copy to me since, after I assumed representation of the Plaintiffs, the records I received were limited.

3. Regarding the revisions to Exhibit A, found on page 2 of the Amendments, the language on WATER USAGE should not be replaced since there is not comparable language in the substituted language.

4. In the Reclamation section, I request that the same provisions apply in the event operations are abandoned or the well ceases to produce and the equipment is removed.

Steve

STEPHEN P. LEIBY
LEIBY HANNA RASNICK
Towne, Evanchan, Palmisano & Hobson, LLC
388 South Main Street, Suite 402
Akron, Ohio 44311
TEL: 330-253-2227
FAX: 330-253-1261

---

**From:** McGranor, Timothy B. [mailto:tbmcgranor@vorys.com]
**Sent:** Monday, January 07, 2013 2:17 PM
**To:** Stephen P. Leiby
**Subject:** RE: Fritz Dairy Farm, L.L.C. et al. v. Chesapeake Exploration, L.L.C.

Do you know when you will hear from them? I have down that the 30-day deadline in the court's order runs next Thursday. I'd like to have this wrapped up well before then.

-Tim

**From:** Stephen P. Leiby [mailto:sleiby@neolaw.biz]
**Sent:** Monday, January 07, 2013 2:02 PM
**To:** McGranor, Timothy B.
**Subject:** RE: Fritz Dairy Farm, L.L.C. et al. v. Chesapeake Exploration, L.L.C.

**NOTE: THE INFORMATION CONTAINED IN THIS E-MAIL IS PRIVILEGED AND
CONFIDENTIAL AND SOLELY FOR THE USE OF THE INTENDED RECIPIENT. IF YOU ARE
NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY REVIEW,
DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS E-MAIL IS STRICTLY
PROHIBITED. IF YOU HAVE RECEIVED THIS E-MAIL BY MISTAKE, IMMEDIATELY DELETE
IT AND ALL COPIES AND SEND A REPLY OR CALL 330-253-2227 (YOU MAY CALL COLLECT)
TO NOTIFY THE SENDER OF THE MISTAKEN TRANSMISSION.**

Tim,

At the moment and without reviewing the agreement, your proposed revisions seem appropriate.

I have not yet responded to your draft of the lease amendment since I want my clients to have every
opportunity to provide me with their input.

Steve

STEPHEN P. LEIBY
LEIBY HANNA RASNICK
Towne, Evanchan, Palmisano & Hobson, LLC
388 South Main Street, Suite 402
Akron, Ohio 44311
TEL: 330-253-2227
FAX: 330-253-1261

**From:** McGranor, Timothy B. [mailto:tbmcgranor@vorys.com]
**Sent:** Monday, January 07, 2013 10:04 AM
**To:** Stephen P. Leiby
**Subject:** RE: Fritz Dairy Farm, L.L.C. et al. v. Chesapeake Exploration, L.L.C.

Steve:

I've had a chance to discuss the proposed agreement with my clients. Here are some suggested changes:

- Rather than attempting to capture the amendment language in the agreement and in the amendment to be
  recorded, the second paragraph should be deleted, and simply say, "The parties agree to amend the leases by
  executing the lease modifications attached hereto as Exhibits 1 and 2."

- We need to add a provision requiring the parties to sign a stipulation of dismissal of the action with prejudice.

- We would like to modify paragraph 4 to delete the current last clause beginning with "except for the terms . . ."
  and replace with "except to enforce the ongoing obligations of the Parties under the Recorded Leases, as
  amended, and to enforce the terms of this Agreement."

- Paragraph 9 needs to be modified to delete reference to execution of the agreement in Ohio. My clients will be
  signing outside Ohio.

2

Please review and let me know your thoughts. Also, please let me know if you have any thoughts or comments on the lease modifications previously sent.

Thanks,
Tim

**From:** Stephen P. Leiby [mailto:sleiby@neolaw.biz]
**Sent:** Wednesday, January 02, 2013 5:33 PM
**To:** Keller, John K.; McGranor, Timothy B.
**Subject:** Fritz Dairy Farm, L.L.C. et al. v. Chesapeake Exploration, L.L.C.

**NOTE: THE INFORMATION CONTAINED IN THIS E-MAIL IS PRIVILEGED AND CONFIDENTIAL AND SOLELY FOR THE USE OF THE INTENDED RECIPIENT. IF YOU ARE NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY REVIEW, DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS E-MAIL IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS E-MAIL BY MISTAKE, IMMEDIATELY DELETE IT AND ALL COPIES AND SEND A REPLY OR CALL 330-253-2227 (YOU MAY CALL COLLECT) TO NOTIFY THE SENDER OF THE MISTAKEN TRANSMISSION.**

Gentlemen,

Attached, for your review and comment, is a draft of a Settlement Agreement and Release in the captioned case. My clients have not seen or read the attached Agreement and its terms are, therefore, subject to their approval.

Please provide me with a copy of the amendment to each of the subject leases at your early convenience.

Steve

STEPHEN P. LEIBY
LEIBY HANNA RASNICK
Towne, Evanchan, Palmisano & Hobson, LLC
388 South Main Street, Suite 402
Akron, Ohio 44311
TEL: 330-253-2227
FAX: 330-253-1261

From the law offices of Vorys, Sater, Seymour and Pease LLP.

IRS CIRCULAR 230 DISCLOSURE:  In order to ensure compliance
with requirements imposed by the U.S. Internal Revenue Service, we
inform you that any federal tax advice contained in this communication
(including any attachments) is not intended or written to be used, and it
cannot be used, by any taxpayer for the purpose of (i) avoiding penalties
that may be imposed under the U.S. Internal Revenue Code or
(ii) promoting, marketing, or recommending to another person, any
transaction or other matter addressed herein.

CONFIDENTIALITY NOTICE: This e-mail message may contain confidential and/or
privileged material. Any unauthorized review, use, disclosure or
distribution is prohibited. If you are not the intended recipient, please

3

contact the sender by reply e-mail and destroy all copies of the original message. If you are the intended recipient but do not wish to receive communications through this medium, please so advise the sender immediately.

From the law offices of Vorys, Sater, Seymour and Pease LLP.

IRS CIRCULAR 230 DISCLOSURE:  In order to ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and it cannot be used, by any taxpayer for the purpose of (i) avoiding penalties that may be imposed under the U.S. Internal Revenue Code or (ii) promoting, marketing, or recommending to another person, any transaction or other matter addressed herein.

---

CONFIDENTIALITY NOTICE: This e-mail message may contain confidential and/or privileged material. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. If you are the intended recipient but do not wish to receive communications through this medium, please so advise the sender immediately.

**McGranor, Timothy B.**

| | |
|---|---|
| **From:** | McGranor, Timothy B. |
| **Sent:** | Wednesday, January 09, 2013 5:18 PM |
| **To:** | 'Stephen P. Leiby' |
| **Subject:** | RE: Fritz Dairy Farm, L.L.C. et al. v. Chesapeake Exploration, L.L.C. |
| **Attachments:** | Lease 1.pdf; Lease 2.pdf |

Steve:

Thank you. I'll review the amendments and get back to you. See below for my responses to your questions.

**From:** Stephen P. Leiby [mailto:sleiby@neolaw.biz]
**Sent:** Wednesday, January 09, 2013 3:56 PM
**To:** McGranor, Timothy B.
**Subject:** RE: Fritz Dairy Farm, L.L.C. et al. v. Chesapeake Exploration, L.L.C.

Tim,

I have talked with Mrs. Fritz and reminded her of the deadline. I have also sent a follow up letter to them.

In an effort to try to keep this moving, attached please find a revised settlement agreement in which I have attempted to take into account your comments and requests.

Regarding the Amendments and Ratifications I have the following observations and requests.

1. CHK Utica, L.L.C. and TOTAL E&P USA, INC. have been added. Have the leases been assigned in part or in whole to them? If so, please provide to me a copy of the assignment(s)?

   Correct. CHK Utica and TOTAL have been assigned partial interests in the leases. The assignments are publicly recorded and available online from the Carroll County Recorder's office website. I'll get you the book/page reference so they'll be easy to find. (I'd send them to you but they are too voluminous.)

2. The Amendments and Ratifications refer to Exhibit A. I discovered that I do not have that Exhibit. Please provide a copy to me since, after I assumed representation of the Plaintiffs, the records I received were limited.

   Attached are copies of the recorded versions of the leases with the unrecorded Exhibit As inserted. The plaintiffs should have these; they had copies at the deposition.

3. Regarding the revisions to Exhibit A, found on page 2 of the Amendments, the language on WATER USAGE should not be replaced since there is not comparable language in the substituted language.

   I will speak to them.

4. In the Reclamation section, I request that the same provisions apply in the event operations are abandoned or the well ceases to produce and the equipment is removed.

   I will speak to them.

Steve

STEPHEN P. LEIBY
LEIBY HANNA RASNICK
Towne, Evanchan, Palmisano & Hobson, LLC

1

388 South Main Street, Suite 402
Akron, Ohio 44311
TEL: 330-253-2227
FAX: 330-253-1261

**From:** McGranor, Timothy B. [mailto:tbmcgranor@vorys.com]
**Sent:** Monday, January 07, 2013 2:17 PM
**To:** Stephen P. Leiby
**Subject:** RE: Fritz Dairy Farm, L.L.C. et al. v. Chesapeake Exploration, L.L.C.

Do you know when you will hear from them?  I have down that the 30-day deadline in the court's order runs next Thursday.  I'd like to have this wrapped up well before then.

-Tim

**From:** Stephen P. Leiby [mailto:sleiby@neolaw.biz]
**Sent:** Monday, January 07, 2013 2:02 PM
**To:** McGranor, Timothy B.
**Subject:** RE: Fritz Dairy Farm, L.L.C. et al. v. Chesapeake Exploration, L.L.C.

**NOTE: THE INFORMATION CONTAINED IN THIS E-MAIL IS PRIVILEGED AND CONFIDENTIAL AND SOLELY FOR THE USE OF THE INTENDED RECIPIENT.  IF YOU ARE NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY REVIEW, DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS E-MAIL IS STRICTLY PROHIBITED.  IF YOU HAVE RECEIVED THIS E-MAIL BY MISTAKE, IMMEDIATELY DELETE IT AND ALL COPIES AND SEND A REPLY OR CALL 330-253-2227 (YOU MAY CALL COLLECT) TO NOTIFY THE SENDER OF THE MISTAKEN TRANSMISSION.**

Tim,

At the moment and without reviewing the agreement, your proposed revisions seem appropriate.

I have not yet responded to your draft of the lease amendment since I want my clients to have every opportunity to provide me with their input.

Steve

STEPHEN P. LEIBY
LEIBY HANNA RASNICK
Towne, Evanchan, Palmisano & Hobson, LLC
388 South Main Street, Suite 402
Akron, Ohio 44311
TEL: 330-253-2227
FAX: 330-253-1261

**From:** McGranor, Timothy B. [mailto:tbmcgranor@vorys.com]
**Sent:** Monday, January 07, 2013 10:04 AM
**To:** Stephen P. Leiby
**Subject:** RE: Fritz Dairy Farm, L.L.C. et al. v. Chesapeake Exploration, L.L.C.

Steve:

I've had a chance to discuss the proposed agreement with my clients.  Here are some suggested changes:

- Rather than attempting to capture the amendment language in the agreement and in the amendment to be recorded, the second paragraph should be deleted, and simply say, "The parties agree to amend the leases by executing the lease modifications attached hereto as Exhibits 1 and 2."

- We need to add a provision requiring the parties to sign a stipulation of dismissal of the action with prejudice.

- We would like to modify paragraph 4 to delete the current last clause beginning with "except for the terms . . ." and replace with "except to enforce the ongoing obligations of the Parties under the Recorded Leases, as amended, and to enforce the terms of this Agreement."

- Paragraph 9 needs to be modified to delete reference to execution of the agreement in Ohio. My clients will be signing outside Ohio.

Please review and let me know your thoughts. Also, please let me know if you have any thoughts or comments on the lease modifications previously sent.

Thanks,
Tim

**From:** Stephen P. Leiby [mailto:sleiby@neolaw.biz]
**Sent:** Wednesday, January 02, 2013 5:33 PM
**To:** Keller, John K.; McGranor, Timothy B.
**Subject:** Fritz Dairy Farm, L.L.C. et al. v. Chesapeake Exploration, L.L.C.

**NOTE: THE INFORMATION CONTAINED IN THIS E-MAIL IS PRIVILEGED AND CONFIDENTIAL AND SOLELY FOR THE USE OF THE INTENDED RECIPIENT. IF YOU ARE NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY REVIEW, DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS E-MAIL IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS E-MAIL BY MISTAKE, IMMEDIATELY DELETE IT AND ALL COPIES AND SEND A REPLY OR CALL 330-253-2227 (YOU MAY CALL COLLECT) TO NOTIFY THE SENDER OF THE MISTAKEN TRANSMISSION.**

Gentlemen,

Attached, for your review and comment, is a draft of a Settlement Agreement and Release in the captioned case. My clients have not seen or read the attached Agreement and its terms are, therefore, subject to their approval.

Please provide me with a copy of the amendment to each of the subject leases at your early convenience.

Steve

STEPHEN P. LEIBY
LEIBY HANNA RASNICK
Towne, Evanchan, Palmisano & Hobson, LLC
388 South Main Street, Suite 402
Akron, Ohio 44311
TEL: 330-253-2227
FAX: 330-253-1261

From the law offices of Vorys, Sater, Seymour and Pease LLP.

IRS CIRCULAR 230 DISCLOSURE:  In order to ensure compliance
with requirements imposed by the U.S. Internal Revenue Service, we
inform you that any federal tax advice contained in this communication
(including any attachments) is not intended or written to be used, and it
cannot be used, by any taxpayer for the purpose of (i) avoiding penalties
that may be imposed under the U.S. Internal Revenue Code or
(ii) promoting, marketing, or recommending to another person, any
transaction or other matter addressed herein.

CONFIDENTIALITY NOTICE: This e-mail message may contain confidential and/or
privileged material. Any unauthorized review, use, disclosure or
distribution is prohibited. If you are not the intended recipient, please
contact the sender by reply e-mail and destroy all copies of the original
message. If you are the intended recipient but do not wish to receive
communications through this medium, please so advise the sender immediately.

From the law offices of Vorys, Sater, Seymour and Pease LLP.

IRS CIRCULAR 230 DISCLOSURE:  In order to ensure compliance
with requirements imposed by the U.S. Internal Revenue Service, we
inform you that any federal tax advice contained in this communication
(including any attachments) is not intended or written to be used, and it
cannot be used, by any taxpayer for the purpose of (i) avoiding penalties
that may be imposed under the U.S. Internal Revenue Code or
(ii) promoting, marketing, or recommending to another person, any
transaction or other matter addressed herein.

CONFIDENTIALITY NOTICE: This e-mail message may contain confidential and/or
privileged material. Any unauthorized review, use, disclosure or
distribution is prohibited. If you are not the intended recipient, please
contact the sender by reply e-mail and destroy all copies of the original
message. If you are the intended recipient but do not wish to receive
communications through this medium, please so advise the sender immediately.

## McGranor, Timothy B.

| | |
|---|---|
| **From:** | McGranor, Timothy B. |
| **Sent:** | Thursday, January 10, 2013 4:42 PM |
| **To:** | 'Stephen P. Leiby' |
| **Subject:** | RE: Fritz Dairy Farm, L.L.C. et al. v. Chesapeake Exploration, L.L.C. |
| **Attachments:** | (15561013)_(2)_Settlement Agreement & Release (rev).DOC; IRS Form W-9.pdf |

Steve:

Getting back to you on some of the items below.  With respect to the assignments you asked about, the assignment to TOTAL is recorded at Book 82 Page 2502.  The assignment to CHK Utica is recorded at Book 77 Page 746–1225.  Here is a link to the website for your convenience:  http://www.landaccess.com/sites/oh/carroll/shared/tract/tract_volpage.php

I've suggested some minor revisions to the agreement, a copy of which is attached, primarily to the timing and form of the dismissal entry.  Since it must be filed by 1/17, we are not going to have time to wait for recording.  And I see no reason not to do this by stipulation of dismissal under Rule 41(a)(1)(A)(ii), rather than motion.  We can put in there that the court will retain jurisdiction to enforce the settlement.

Also, Kenyon was not listed as a signatory, so I've fixed that.

For the settlement payment, we will need whoever will be a payee on the settlement check to sign W-9s. The form is attached for your convenience.

Finally, my client's land department is evaluating the changes to the modification forms that you requested in #3 and #4 below.  I will let you know as soon as I hear back from them.

Please let me know if you have any questions.

-Tim

**From:** Stephen P. Leiby [mailto:sleiby@neolaw.biz]
**Sent:** Wednesday, January 09, 2013 3:56 PM
**To:** McGranor, Timothy B.
**Subject:** RE: Fritz Dairy Farm, L.L.C. et al. v. Chesapeake Exploration, L.L.C.

Tim,

I have talked with Mrs. Fritz and reminded her of the deadline.  I have also sent a follow up letter to them.

In an effort to try to keep this moving, attached please find a revised settlement agreement in which I have attempted to take into account your comments and requests.

Regarding the Amendments and Ratifications I have the following observations and requests.

1.  CHK Utica, L.L.C. and TOTAL E&P USA, INC. have been added.  Have the leases been assigned in part or in whole to them?  If so, please provide to me a copy of the assignment(s).

2.  The Amendments and Ratifications refer to Exhibit A.  I discovered that I do not have that Exhibit. Please provide a copy to me since, after I assumed representation of the Plaintiffs, the records I received were limited.

3. Regarding the revisions to Exhibit A, found on page 2 of the Amendments, the language on WATER USAGE should not be replaced since there is not comparable language in the substituted language.

4. In the Reclamation section, I request that the same provisions apply in the event operations are abandoned or the well ceases to produce and the equipment is removed.

Steve

STEPHEN P. LEIBY
LEIBY HANNA RASNICK
Towne, Evanchan, Palmisano & Hobson, LLC
388 South Main Street, Suite 402
Akron, Ohio 44311
TEL: 330-253-2227
FAX: 330-253-1261

**From:** McGranor, Timothy B. [mailto:tbmcgranor@vorys.com]
**Sent:** Monday, January 07, 2013 2:17 PM
**To:** Stephen P. Leiby
**Subject:** RE: Fritz Dairy Farm, L.L.C. et al. v. Chesapeake Exploration, L.L.C.

Do you know when you will hear from them? I have down that the 30-day deadline in the court's order runs next Thursday. I'd like to have this wrapped up well before then.

-Tim

**From:** Stephen P. Leiby [mailto:sleiby@neolaw.biz]
**Sent:** Monday, January 07, 2013 2:02 PM
**To:** McGranor, Timothy B.
**Subject:** RE: Fritz Dairy Farm, L.L.C. et al. v. Chesapeake Exploration, L.L.C.

**NOTE: THE INFORMATION CONTAINED IN THIS E-MAIL IS PRIVILEGED AND CONFIDENTIAL AND SOLELY FOR THE USE OF THE INTENDED RECIPIENT. IF YOU ARE NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY REVIEW, DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS E-MAIL IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS E-MAIL BY MISTAKE, IMMEDIATELY DELETE IT AND ALL COPIES AND SEND A REPLY OR CALL 330-253-2227 (YOU MAY CALL COLLECT) TO NOTIFY THE SENDER OF THE MISTAKEN TRANSMISSION.**

Tim,

At the moment and without reviewing the agreement, your proposed revisions seem appropriate.

I have not yet responded to your draft of the lease amendment since I want my clients to have every opportunity to provide me with their input.

Steve

STEPHEN P. LEIBY
LEIBY HANNA RASNICK
Towne, Evanchan, Palmisano & Hobson, LLC
388 South Main Street, Suite 402
Akron, Ohio 44311
TEL: 330-253-2227
FAX: 330-253-1261

2

**From:** McGranor, Timothy B. [mailto:tbmcgranor@vorys.com]
**Sent:** Monday, January 07, 2013 10:04 AM
**To:** Stephen P. Leiby
**Subject:** RE: Fritz Dairy Farm, L.L.C. et al. v. Chesapeake Exploration, L.L.C.

Steve:

I've had a chance to discuss the proposed agreement with my clients. Here are some suggested changes:

- Rather than attempting to capture the amendment language in the agreement and in the amendment to be recorded, the second paragraph should be deleted, and simply say, "The parties agree to amend the leases by executing the lease modifications attached hereto as Exhibits 1 and 2."

- We need to add a provision requiring the parties to sign a stipulation of dismissal of the action with prejudice.

- We would like to modify paragraph 4 to delete the current last clause beginning with "except for the terms . . ." and replace with "except to enforce the ongoing obligations of the Parties under the Recorded Leases, as amended, and to enforce the terms of this Agreement."

- Paragraph 9 needs to be modified to delete reference to execution of the agreement in Ohio. My clients will be signing outside Ohio.

Please review and let me know your thoughts. Also, please let me know if you have any thoughts or comments on the lease modifications previously sent.

Thanks,
Tim




**From:** Stephen P. Leiby [mailto:sleiby@neolaw.biz]
**Sent:** Wednesday, January 02, 2013 5:33 PM
**To:** Keller, John K.; McGranor, Timothy B.
**Subject:** Fritz Dairy Farm, L.L.C. et al. v. Chesapeake Exploration, L.L.C.

**NOTE: THE INFORMATION CONTAINED IN THIS E-MAIL IS PRIVILEGED AND CONFIDENTIAL AND SOLELY FOR THE USE OF THE INTENDED RECIPIENT. IF YOU ARE NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY REVIEW, DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS E-MAIL IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS E-MAIL BY MISTAKE, IMMEDIATELY DELETE IT AND ALL COPIES AND SEND A REPLY OR CALL 330-253-2227 (YOU MAY CALL COLLECT) TO NOTIFY THE SENDER OF THE MISTAKEN TRANSMISSION.**

Gentlemen,

Attached, for your review and comment, is a draft of a Settlement Agreement and Release in the captioned case. My clients have not seen or read the attached Agreement and its terms are, therefore, subject to their approval.

Please provide me with a copy of the amendment to each of the subject leases at your early convenience.

Steve

STEPHEN P. LEIBY
LEIBY HANNA RASNICK
Towne, Evanchan, Palmisano & Hobson, LLC
388 South Main Street, Suite 402
Akron, Ohio 44311
TEL: 330-253-2227
FAX: 330-253-1261

From the law offices of Vorys, Sater, Seymour and Pease LLP.

IRS CIRCULAR 230 DISCLOSURE:  In order to ensure compliance
with requirements imposed by the U.S. Internal Revenue Service, we
inform you that any federal tax advice contained in this communication
(including any attachments) is not intended or written to be used, and it
cannot be used, by any taxpayer for the purpose of (i) avoiding penalties
 that may be imposed under the U.S. Internal Revenue Code or
(ii) promoting, marketing, or recommending to another person, any
transaction or other matter addressed herein.

CONFIDENTIALITY NOTICE: This e-mail message may contain confidential and/or
privileged material. Any unauthorized review, use, disclosure or
distribution is prohibited. If you are not the intended recipient, please
contact the sender by reply e-mail and destroy all copies of the original
message. If you are the intended recipient but do not wish to receive
communications through this medium, please so advise the sender immediately.

From the law offices of Vorys, Sater, Seymour and Pease LLP.

IRS CIRCULAR 230 DISCLOSURE:  In order to ensure compliance
with requirements imposed by the U.S. Internal Revenue Service, we
inform you that any federal tax advice contained in this communication
(including any attachments) is not intended or written to be used, and it
cannot be used, by any taxpayer for the purpose of (i) avoiding penalties
 that may be imposed under the U.S. Internal Revenue Code or
(ii) promoting, marketing, or recommending to another person, any
transaction or other matter addressed herein.

CONFIDENTIALITY NOTICE: This e-mail message may contain confidential and/or
privileged material. Any unauthorized review, use, disclosure or
distribution is prohibited. If you are not the intended recipient, please
contact the sender by reply e-mail and destroy all copies of the original
message. If you are the intended recipient but do not wish to receive
communications through this medium, please so advise the sender immediately.

**McGranor, Timothy B.**

| | |
|---|---|
| **From:** | McGranor, Timothy B. |
| **Sent:** | Monday, January 14, 2013 4:49 PM |
| **To:** | 'Stephen P. Leiby' |
| **Subject:** | FW: Fritz Dairy Farms settlement |
| **Attachments:** | 73391 0 MAS_(UTICA_MODIFICATION_FORM)_CARTER_CHARLES__JSWEITZER-2 (3).pdf; 34387 0 CAR_(UTICA_PARTIAL_OWNER_MOD)_Fritz_Mark_R_JSWEITZER-2.pdf |

**Importance:**     High

Steve:

As mentioned in my prior e-mail, attached are revised versions of the lease modifications. Please let me know if you have any questions.

-Tim

**Timothy B. McGranor**
*Attorney at Law*

Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
Columbus, OH 43215

Direct: 614.464.8205
Fax: 614.719.4954
E-mail: tbmcgranor@vorys.com
www.vorys.com

---

**From:** McGranor, Timothy B.
**Sent:** Monday, January 14, 2013 1:38 PM
**To:** 'Stephen P. Leiby'
**Subject:** Fritz Dairy Farms settlement
**Importance:** High

Steve:

This e-mail confirms our conversation earlier today regarding your e-mail below. Obviously, my clients disagree that your clients still have the ability to back out of the settlement. The terms of the settlement were placed on the record at our status conference on December 17, 2012, and were taken down by the Court reporter. The settlement is binding. Your clients agreed to release their claims and amend the lease to provide for a 7.5 year primary term, in exchange for payment of $10,000 and amendments to the lease to provide for additional water protection language and reclamation provisions.

As we discussed, I need a response no later than mid-day tomorrow (let's say 1:30 p.m.) that your clients will sign the necessary documents to fulfill their settlement obligations. Otherwise, I will have to take appropriate steps with the Court to enforce the settlement.

With respect to the lease modifications that were previously sent to you, you had two questions on behalf of your clients:

3. Regarding the revisions to Exhibit A, found on page 2 of the Amendments, the language on WATER USAGE should not be replaced since there is not comparable language in the substituted language.

1

4.   In the Reclamation section, I request that the same provisions apply in the event operations are abandoned or the well ceases to produce and the equipment is removed.

With respect to point 3, we agree that the water usage language included in the modification should be in addition to, not instead of, the language in the existing Exhibit A.  We will make that change.

With respect to point 4, the language proposed does, in fact, apply in the event operations are abandoned or the well ceases to produce:

> RECLAMATION: To the extent Lessee's drilling operations actually disturb the surface of the leased premises, it is agreed and understood that the Lessee shall repair and restore the surface of the leased premises as nearly as practicable to the condition in which it existed at the time Lessee commenced drilling operations upon the leased premises. Such work shall be completed within a reasonable amount of time after all cessation of drilling, completion, equipping and other related operations upon the leased premises at the sole expense of the Lessee. Lessee shall remove all debris, equipment, and personal property which Lessee placed on the leased premises (except for equipment needed for the operation of producing wells, *which shall be removed within six (6) months after a well permanently ceases to produce*).

I will forward revised modifications to the leases for your clients' signature that incorporate the change discussed in connection with point #3 as soon as possible.

Please confirm no later than 1:30 p.m. tomorrow afternoon that your clients will be signing the settlement documents.

I look forward to hearing from you.

-Tim

**Timothy B. McGranor**
*Attorney at Law*

Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
Columbus, OH  43215

Direct: 614.464.8205
Fax: 614.719.4954
E-mail:  tbmcgranor@vorys.com
www.vorys.com

---

**From:** Stephen P. Leiby [mailto:sleiby@neolaw.biz]
**Sent:** Monday, January 14, 2013 11:58 AM
**To:** McGranor, Timothy B.
**Subject:**


Tim,

As of 11:55 AM today, I do not have any commitment from my clients regarding the terms of the settlement agreement or the lease amendment and ratification. At this point my hands are tied. I will inform you the minute I receive, if I do, a definitive commitment from my clients.

Steve

STEPHEN P. LEIBY
LEIBY HANNA RASNICK

Towne, Evanchan, Palmisano & Hobson, LLC
388 South Main Street, Suite 402
Akron, Ohio 44311
TEL: 330-253-2227
FAX: 330-253-1261

# INDEX 6

## DOC #20-3 AMENDMENT & RATIFICATIONS

# RECEIPT

The undersigned hereby acknowledges receipt and acceptance of Ten and 00/100 dollars ($10.00) as consideration paid for an Amendment and Ratification of Oil and Gas Lease dated January 15, 2013 between the undersigned as Lessor and Chesapeake Exploration, L.L.C. as Lessee, covering 102.8200 Leasehold acres in:

**AUGUSTA TOWNSHIP, CARROLL COUNTY**

Tax Map/Parcel Number(s):
0100063000.

**WASHINGTON TOWNSHIP, CARROLL COUNTY**

Tax Map/Parcel Number(s):
3400296009,        3400296010

Executed this _____ day of _____ 20_____.


Fritz Dairy Farms, L.L.C.


_____
By: Mark R. Fritz, Owner


73391  OMAS

Lease Number: 34-000127-000

# AMENDMENT AND RATIFICATION
## OF OIL AND GAS LEASE

THIS AMENDMENT AND RATIFICATION OF OIL AND GAS LEASE (this *"Amendment"*) is made as of the  15th  day of January, 2013 by and between **Fritz Dairy Farms, L.L.C.**, having an address at **6301 Mackel Rd., Minerva, OH 44657**, (the *"Lessor"*), and **Chesapeake Exploration, L.L.C.**, an Oklahoma limited liability company, with its principal office located at 6100 N. Western Avenue, Oklahoma City, Oklahoma 73118; **CHK Utica, L.L.C.**, a Delaware limited liability company, with its principal office located at 6100 N. Western Avenue, Oklahoma City, Oklahoma 73118; **TOTAL E&P USA, INC.**, a Delaware corporation, with its principal office located at 1201 Louisiana, Suite 1800, Houston, Texas 77002; (collectively, the *"Lessee"*).

## RECITALS

**WHEREAS**, Lessor and Lessee are parties, by execution or by succession, to that certain Oil and Gas Lease dated **July 27, 2010** which Oil and Gas Lease, or a memorandum in lieu thereof, was filed for record in **CARROLL** County, **OHIO** on August 13, 2010 at **Instrument No. 201000002894, Book 62, Page 163** (the *"Lease"*); and

**WHEREAS**, the Lease covers lands described as Tax Map/Parcel Numbers:

0100063000,            3400296009,          3400296010,

containing a total of approximately **102.8200** acres, more or less, situated in **AUGUSTA and WASHINGTON** Township, **CARROLL** County, **OHIO** and which lands are more particularly described in the Lease (the *"Leased Premises"*); and

**WHEREAS**, Lessor and Lessee, for their mutual benefit, desire to amend and modify the Lease set forth herein.

## AGREEMENT

**NOW THEREFORE**, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and the mutual promises contained herein, Lessor and Lessee agree as follows:

*A portion of a Paragraph of the Lease originally stated the following:*

*This Lease shall remain in force for a primary term of FIVE (5) years from 12:00 A.M. July 27, 2010 (effective date) to 11:59 P.M. July 27, 2015 (last day of primary term)...*

*Said portion of a Paragraph of the Lease is hereby replaced in its entirety with the following:*

73391   0MAS

This Lease shall remain in force for a primary term of SEVEN and ONE HALF  (7 1/2) years from 12:00 A.M. July 27, 2010 (effective date) to 11:59 P.M. January 27, 2018 (last day of primary term)...

A Paragraph of the Lease originally stated the following:

EXTENSION OF PRIMARY TERM. Lessee has the option to extend the primary term of this Lease for one additional term of five (5) years from the expiration of the primary term of this Lease; said extension to be under the same terms and conditions as contained in this Lease. Lessee may exercise this option to extend this Lease if on or before the expiration date of the primary term of this Lease, Lessee pays or tenders to the Lessor or to the Lessor's credit an amount  equal to the initial consideration given for the execution hereof. Exercise of this option is at Lessee's sole discretion and may be invoked by Lessee where no other alternative of the Lease Term clause extends this Lease beyond the primary term.

Said Paragraph is hereby deleted in its entirety.

The Lease is hereby further amended to include the following:

RECLAMATION: To the extent Lessee's drilling operations actually disturb the surface of the leased premises, it is agreed and understood that the Lessee shall repair and restore the surface of the leased premises as nearly as practicable to the condition in which it existed at the time Lessee commenced drilling operations upon the leased premises. Such work shall be completed within a reasonable amount of time after all cessation of drilling, completion, equipping and other related operations upon the leased premises and otherwise within six months after the last producing well permanently ceases to produce at the sole expense of the Lessee. Lessee shall remove all debris, equipment, and personal property which Lessee placed on the leased premises (except for equipment needed for the operation of producing wells, which shall be removed within six (6) months after the last producing well permanently ceases to produce).

WATER QUALITY TESTING: Prior to commencing drilling operations, Lessee, at its sole cost and expense, shall test the water quality of Lessor's water source(s) located within Twenty-five Hundred feet (2,500') of Lessee's well pad that are identified by Lessor as currently utilized for human and/or domestic livestock consumption.  Lessor's water sources being tested must have functioning pumps installed.

Samples from Lessor's water source(s), covered by this agreement, will be analyzed for Lessee's standard baseline parameter list of general water quality indicators. Testing of Lessor's water supply shall be conducted by an independent testing laboratory, selected by Lessee, having state and/or National Environmental Laboratory Accreditation Program (NELAP) accreditations. Lessor shall be notified prior to any water sampling events, and Lessor or its agents or representatives shall have the right to be present during such events. The results of these tests will be provided to Lessor within 30 days of Lessee's receipt of the final results from the independent testing laboratory unless otherwise required by state or regulatory agency.  Only non-invasive means of testing shall be used; Lessee shall not be required to pull pumps, move windmills, etc.

In the event the water quality of such water source(s) is reduced as a direct result of Lessee's operations on said Lands, such that the water is unusable for human and/or domestic livestock consumption (as the case may be), Lessee shall evaluate and perform such steps to restore

73391  0MAS

*Lessor's water quality of Lessor's water source(s). Lessee shall not be responsible for diminished water quality of Lessor's water source(s) due to causes out of the Lessee's control, including but not limited to seasonal variability and drought conditions.*

Lessor ratifies and confirms the Lease, and all of its terms and provisions, as amended above, and does hereby grant, lease and let the Leased Premises unto Lessee subject to and under the terms and provisions of Lease and this Amendment, and hereby agrees and acknowledges that said Lease is valid and shall remain in full force and effect according to the terms and provisions thereof.

Lessor and Lessee agree that this Amendment shall be binding upon them, their heirs, personal representatives, successors and assigns.

This Amendment may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Amendment and all of which, when taken together, will be deemed to constitute one and the same agreement.

If any of the above stated provisions in this Amendment conflict with or are inconsistent with the printed provisions or terms of the Lease, the above stated provisions in this Amendment shall control.

**IN WITNESS WHEREOF,** Lessor and Lessee have caused this Amendment to be duly executed on the date first above written.

**LESSOR:**

Fritz Dairy Farms, L.L.C.

_____

By: Mark R. Fritz, Owner

ACKNOWLEDGEMENT

STATE OF _____

COUNTY OF _____

On this, the _____ day of _____, _____ before me the undersigned officer, personally appeared
_____ known to me to be the _____ of
that he as such _____, being authorized to execute foregoing instrument for the purpose therein contained by
signing the name of the _____ by himself as _____.

IN WITNESS WEHREOF, I here unto set my hand and official seal.

My Commission expires: _____

73391   0MAS

LESSEE:

**Chesapeake Exploration, L.L.C.**
an Oklahoma limited liability company

By: _____

    Lester A. Zitkus, Vice President- Land
    Eastern Division

## CORPORATE ACKNOWLEDGMENT

STATE OF OKLAHOMA    }
                     } SS:
COUNTY OF OKLAHOMA  }

On this, the _____ day of _____, 20_____, before me _____ the
undersigned officer, personally appeared Lester A. Zitkus, who acknowledged himself to be the Vice President –
Land, Eastern Division of Chesapeake Exploration, L.L.C., an Oklahoma limited liability company, and that he as
such Vice President – Land, Eastern Division, being authorized to do so, executed the foregoing instrument for the
purpose therein contained by signing the name of the limited liability company by himself as Vice President – Land,
Eastern Division.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

    My Commission Expires: _____

    Signature/Notary Public: _____

    Name/Notary Public (print): _____

73391  6MAS

LESSEE:

**CHK Utica, L.L.C.**
A Delaware limited liability company

By: _____
     Lester A. Zitkus, Vice President- Land
     Eastern Division


## CORPORATE ACKNOWLEDGMENT

STATE OF OKLAHOMA       }
                     } SS:
COUNTY OF OKLAHOMA   }

On this, the _____ day of _____, 20_____, before me _____ the undersigned officer, personally appeared Lester A. Zitkus, who acknowledged himself to be the Vice President – Land, Eastern Division of **CHK Utica, L.L.C.**, an Oklahoma limited liability company, and that he as such Vice President – Land, Eastern Division, being authorized to do so, executed the foregoing instrument for the purpose therein contained by signing the name of the limited liability company by himself as Vice President – Land, Eastern Division.


IN WITNESS WHEREOF, I hereunto set my hand and official seal.

     My Commission Expires: _____

     Signature/Notary Public: _____

     Name/Notary Public (print): _____

LESSEE:

**TOTAL E&P USA, INC.,**
a Delaware corporation

By: _____

    Fabien Colmet Daage
    Vice President, Business Development & Strategy

## CORPORATE ACKNOWLEDGMENT

STATE OF TEXAS      }
               } SS:
COUNTY OF HARRIS   }

The foregoing instrument was acknowledged before me this _____ day of _____, 20_____, by Fabien Colmet Daage, Vice President, Business Development & Strategy of **TOTAL E&P USA, INC.**, a Delaware corporation, as the act and deed and on behalf of such corporation.

_____
Notary Public in and for the State of Texas

**Prepared By:**
Once recorded, please return to: Chesapeake Exploration, L.L.C., Attention: Land –
Eastern Division, 6100 N. Western Avenue, Oklahoma City, Oklahoma 73118

73591  0MA5

# RECEIPT

The undersigned hereby acknowledges receipt and acceptance of Ten and 00/100 dollars ($10.00) as consideration paid for an Amendment and Ratification of Oil and Gas Lease dated January 15, 2013 between the undersigned as Lessor and Chesapeake Exploration, L.L.C. as Lessee, covering 27.3500 Leasehold acres in:

**AUGUSTA TOWNSHIP, CARROLL COUNTY**
**Tax Map/Parcel Number(s):**
0100427001.

Executed this _____ day of _____ 20_____ .


_____
Mark R. Fritz

_____
Michelle E. Fritz

34387  0CAR

Lease Number: <u>34-000126-000</u>

## AMENDMENT AND RATIFICATION
## OF OIL AND GAS LEASE

THIS AMENDMENT AND RATIFICATION OF OIL AND GAS LEASE (this *"Amendment"*) is made as of the 15th day of January, 2013 by and between **Mark R. Fritz and Michelle E. Fritz, husband and wife**, having an address at **6301 Mackel Rd. NE, Minerva, OH 44657**. (the *"Lessor"*), and **Chesapeake Exploration, L.L.C.**, an Oklahoma limited liability company, with its principal office located at 6100 N. Western Avenue, Oklahoma City, Oklahoma 73118; **CHK Utica, L.L.C.**, a Delaware limited liability company, with its principal office located at 6100 N. Western Avenue, Oklahoma City, Oklahoma 73118; **TOTAL E&P USA, INC.**, a Delaware corporation, with its principal office located at 1201 Louisiana, Suite 1800, Houston, Texas 77002; (collectively, the *"Lessee"*).

### RECITALS

WHEREAS, Lessor and Lessee are parties, by execution or by succession, to that certain Oil and Gas Lease dated **July 27, 2010** which Oil and Gas Lease, or a memorandum in lieu thereof, was filed for record in **CARROLL** County, **OHIO** on August 13, 2010 at **Instrument No. 201000002896, Book 62, Page 176** (the *"Lease"*); and

WHEREAS, the Lease covers lands described as:

containing a total of approximately **39.4635** acres, more or less, situated in **AUGUSTA** Township, CARROLL County, OHIO and which lands are more particularly described in the Lease, being all the land covered by the Lease in said Township; and

WHEREAS, the Lessor owns a portion of the lands covered by the Lease, currently known as:

**Property Tax Parcel Identification:** 0100427001,

containing a total of approximately **27.3500** acres, more or less, situated in **AUGUSTA** Township, **CARROLL** County, **OHIO** (the "Leased Premises"); and

WHEREAS, Lessor and Lessee, for their mutual benefit, desire to amend and modify the Lease set forth herein.

### AGREEMENT

NOW THEREFORE, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and the mutual promises contained herein, Lessor and Lessee agree as follows:

*A portion of a Paragraph of the Lease originally stated the following:*

24387  0CAR

This Lease shall remain in force for a primary term of FIVE (5) years from 12:00 A.M. July 27, 2010 (effective date) to 11:59 P.M. July 27, 2015 (last day of primary term)...

Said portion of a Paragraph of the Lease is hereby replaced in its entirety with the following:

This Lease shall remain in force for a primary term of SEVEN and ONE HALF (7 1/2) years from 12:00 A.M. July 27, 2010 (effective date) to 11:59 P.M. January 27, 2018 (last day of primary term)...

A Paragraph of the Lease originally stated the following:

EXTENSION OF PRIMARY TERM. Lessee has the option to extend the primary term of this Lease for one additional term of five (5) years from the expiration of the primary term of this Lease; said extension to be under the same terms and conditions as contained in this Lease. Lessee may exercise this option to extend this Lease if on or before the expiration date of the primary term of this Lease, Lessee pays or tenders to the Lessor or to the Lessor's credit an amount equal to the initial consideration given for the execution hereof. Exercise of this option is at Lessee's sole discretion and may be invoked by Lessee where no other alternative of the Lease Term clause extends this Lease beyond the primary term.

Said Paragraph is hereby deleted in its entirety.

The Lease is hereby further amended to include the following:

RECLAMATION: To the extent Lessee's drilling operations actually disturb the surface of the leased premises, it is agreed and understood that the Lessee shall repair and restore the surface of the leased premises as nearly as practicable to the condition in which it existed at the time Lessee commenced drilling operations upon the leased premises. Such work shall be completed within a reasonable amount of time after all cessation of drilling, completion, equipping and other related operations upon the leased premises and otherwise within six months after the last producing well permanently ceases to produce at the sole expense of the Lessee. Lessee shall remove all debris, equipment, and personal property which Lessee placed on the leased premises (except for equipment needed for the operation of producing wells, which shall be removed within six (6) months after the last producing well permanently ceases to produce).

WATER QUALITY TESTING: Prior to commencing drilling operations, Lessee, at its sole cost and expense, shall test the water quality of Lessor's water source(s) located within Twenty-five Hundred feet (2,500') of Lessee's well pad that are identified by Lessor as currently utilized for human and/or domestic livestock consumption. Lessor's water sources being tested must have functioning pumps installed.

Samples from Lessor's water source(s), covered by this agreement, will be analyzed for Lessee's standard baseline parameter list of general water quality indicators. Testing of Lessor's water supply shall be conducted by an independent testing laboratory, selected by Lessee, having state and/or National Environmental Laboratory Accreditation Program (NELAP) accreditations. Lessor shall be notified prior to any water sampling events, and Lessor or its agents or representatives shall have the right to be present during such events. The results of these tests will be provided to Lessor within 30 days of Lessee's receipt of the final results from the independent testing laboratory unless otherwise required by state or regulatory agency. Only

34387  0CAR

*non-invasive means of testing shall be used; Lessee shall not be required to pull pumps, move windmills, etc.*

*In the event the water quality of such water source(s) is reduced as a direct result of Lessee's operations on said Lands, such that the water is unusable for human and/or domestic livestock consumption (as the case may be), Lessee shall evaluate and perform such steps to restore Lessor's water quality of Lessor's water source(s). Lessee shall not be responsible for diminished water quality of Lessor's water source(s) due to causes out of the Lessee's control, including but not limited to seasonal variability and drought conditions.*

Lessor ratifies and confirms the Lease, and all of its terms and provisions, as amended above, and does hereby grant, lease and let the Leased Premises unto Lessee subject to and under the terms and provisions of Lease and this Amendment, and hereby agrees and acknowledges that said Lease is valid and shall remain in full force and effect according to the terms and provisions thereof.

Lessor and Lessee agree that this Amendment shall be binding upon them, their heirs, personal representatives, successors and assigns.

This Amendment may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Amendment and all of which, when taken together, will be deemed to constitute one and the same agreement.

If any of the above stated provisions in this Amendment conflict with or are inconsistent with the printed provisions or terms of the Lease, the above stated provisions in this Amendment shall control.

**IN WITNESS WHEREOF**, Lessor and Lessee have caused this Amendment to be duly executed on the date first above written.

**LESSOR:**

_____
Mark R. Fritz

_____
Michelle E. Fritz

## ACKNOWLEDGEMENT

STATE OF _____  }
                                                            }  ss.
COUNTY OF _____  }

On this, the _____ day of _____, _____, before me _____, the undersigned officer, personally appeared **Mark R. Fritz and Michelle E. Fritz, husband and wife**, known to me (or satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged that they executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I here unto set my hand and official seal.

My Commission expires: _____

Signature/Notary Public: _____

Name/Notary Public (print): _____

LESSEE:

**Chesapeake Exploration, L.L.C.**
an Oklahoma limited liability company

By: _____
     Lester A. Zitkus,
     Vice President- Land, Eastern Division

## CORPORATE ACKNOWLEDGMENT

STATE OF OKLAHOMA       }
                      } SS:
COUNTY OF OKLAHOMA    }

On this, the _____ day of _____, 20_____, before me _____ the
undersigned officer, personally appeared Lester A. Zitkus, who acknowledged himself to be the Vice President –
Land, Eastern Division of Chesapeake Exploration, L.L.C., an Oklahoma limited liability company, and that he as
such Vice President – Land, Eastern Division, being authorized to do so, executed the foregoing instrument for the
purpose therein contained by signing the name of the limited liability company by himself as Vice President – Land,
Eastern Division.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

             My Commission Expires: _____

             Signature/Notary Public: _____

             Name/Notary Public (print): _____

LESSEE:

**CHK Utica, L.L.C.**
A Delaware limited liability company

By: _____
    Lester A. Zitkus,
    Vice President- Land, Eastern Division


## CORPORATE ACKNOWLEDGMENT

STATE OF OKLAHOMA     }
                      } SS:
COUNTY OF OKLAHOMA  }

On this, the _____ day of _____, 20_____, before me _____ the
undersigned officer, personally appeared Lester A. Zitkus, who acknowledged himself to be the Vice President –
Land, Eastern Division of CHK Utica, L.L.C., an Oklahoma limited liability company, and that he as such Vice
President – Land, Eastern Division, being authorized to do so, executed the foregoing instrument for the purpose
therein contained by signing the name of the limited liability company by himself as Vice President – Land, Eastern
Division.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

           My Commission Expires: _____

           Signature/Notary Public: _____

           Name/Notary Public (print): _____

LESSEE:

**TOTAL E&P USA, INC.**
a Delaware corporation

By: _____
    Fabien Colmet Daage
    Vice President, Business Development & Strategy


## CORPORATE ACKNOWLEDGMENT

STATE OF TEXAS      }
                    } SS:
COUNTY OF HARRIS    }

The foregoing instrument was acknowledged before me this ____ day of _____, 20_____, by Fabien
Colmet Daage, Vice President, Business Development & Strategy of TOTAL E&P USA, INC., a Delaware
corporation, as the act and deed and on behalf of such corporation.


                              _____
                              Notary Public in and for the State of Texas


**Prepared By:**
Once recorded, please return to: Chesapeake Exploration, L.L.C., Attention: Land –
Eastern Division, 6100 N. Western Avenue, Oklahoma City, Oklahoma 73118


34387  0CAR

# ITEM 7

## DOC. #27   LETTER TO COURT

Fritz Dairy Farm LLC
Mark R. Fritz & Michele E. Fritz
6301 Mackel Rd. N.E.
Minerva, Ohio 44657
(330) 895-2876

January 14, 2013

United States District Court Judge John R. Adams
For the Northern District of Ohio, Eastern Division
C/o John F. Seiberling Federal Building and US Courthouse
2 South Main Street  Akron, Ohio 44308

RECEIVED

JAN 1 5 2013

at _____
CLERK OF COURT
U.S. DISTRICT COURT, N.D.O.

Re: *Mark R. Fritz; Michele E. Frits &*
*Fritz Dairy Farms, LLC, Plaintiffs vs.*
*Chesapeake Exploration, LLC; Kenyon*
*Energy, LLC & Richard Owen, Defendants*
*Case No. 5:12. CV-01736-JRA*

Honorable Judge R. Adams:

We may disappoint you-and most likely our current counsel. For that we are sincerely
sorry. Our new counsel, Mr. Leiby and Mr. Hobson are not aware of this letter.

We are simple folks. My husband lived and worked on the family farm all of his life. My
family owned a furniture store in Minerva for 47 years and my family and father grew up just a
few miles from our farm during the depression. My husband was the youngest of 10 children.

We have tried to do right by our neighbors and friends and they to us. If they said they
would help us out, they did, and we would do the same for them when needed. An agreement
was not even a matter of a handshake. It was simply our word as to what was right and expected.

A.  *Essential Facts Surrounding Our July 30, 2010 Kenyon Leases*

•  *Single 5 Year Lease Term; Smaller Lease Bonus;*
*Refusal of Long Term Tie Up of Our Land*

We expected the same from Richard Owen, Kenyon Energy and Chesapeake Exploration
when we negotiated over the terms of our 2 oil and gas leases in the summer of 2010[1]. After six

_____

[1] We are unsure as to the appropriate way of submitting this letter, pleading or motion for relief to this Honorable
Court. However we want Your Honor to know that all our statements in this letter are true and correct to our best
understanding and belief. We have obtained and attached certified copies of certain important documents, as
indicated. All text messages or emails we refer to are true and copies of those on our cell phones or computers. We

[Summary of pleading]  - 1

00001

or more weeks of back and forth and different lease versions, we decided and became adamant about not wanting to lease or tie up our lands for any long period of time, certainly no longer than a single five year primary term. In spite of countless requests by Mr. Owen and others at Kenyon Energy, we made it very clear we only wanted to execute the July 27, 2010 leases that were limited to a single 5 year term. In making that decision, we understood that Kenyon proposed to offer us more lease bonus money for an additional five year option and we understood a neighbor received $250 more per acre for a lease with a 5 year primary term and an option to renew for another or second 5 year term. That simply was not our goal or agreement.

- *Lease Forms Prepared by Kenyon Energy*

As they had done previously for earlier lease drafts, Mr. Owens and Kenyon prepared the final versions of our July 30, 2010 leases, including Lease Exhibit A provisions designed to protect our lands, crops and livestock during exploration and production. One such provision prevented the lessee from using water from lands.

- *2006 Leases with Great Lakes Energy & Single 5 Year Term*

Our land is our life and livelihood and we did not want any rights to our land signed up for longer than 5 years at a time. In 2006, we made the same decision when we leased our other property to Great Lakes Energy for what we intended and understood was a single 5 year term. [2] Mr. Owen knew about those leases and asked us to call him when those parcels became available in October, 2011 and he would attempt to get us the best lease terms possible.

We also felt that having the dates and terms of our leases roughly coincide would also make it easier for our farm accounting. To our knowledge, none of our lands have ever been drilled or mined for oil, gas or other minerals. In the past, we used whatever lease bonus payments we received to pay for tractor, other equipment or feed needs or commitments.

You're Honor you can see how the signature pages state the leases were prepared by Kenyon and include Exhibits A and B. And yet, the filed Kenyon Leases are missing Exhibit A

- *Preparation, Execution, Notarization and*
  *Kenyon Lease Originals on July 30, 2010*

About 9:00 am July 30, 2010, Richard Owen brought us two sets of original Kenyon Lease to our house. Kenyon or Mr. Owen had already prepared them in full. All originals provided for a single 5 year primary term. The provisions at the top of page 2 which otherwise created a 5 year renewal option *were crossed through and lined out by Kenyon or Richard Owen when given to us that morning.*

did not have the time to collect certified copies of all included documents but they are true and correct copies of the originals or filed documents.
[2] As our misfortunes would have it, EnerVest [the successor to Great Lakes] originally thought so too but then found a sentence buried at the leases' end to dispute their 2011 termination.

[Summary of pleading] - 2

Mr. Owen said he had another landowner to meet about leasing their land and therefore did not want to accompany us to our bank in Minerva where we planned to have the Kenyon Leases notarized. Mark and I immediately took both original sets of those two leases to our bank in Minerva and had Mrs. Donna Kandel notarize both sets. We specifically signed our initials alongside that paragraph indicating our approval to its deletion, as reproduced above. The drive took less than 10 minutes. After we had the Kenyon Leases notarized, we called Mr. Owen who met us back at our house as we arrived. He took one original fully executed set of the Kenyon Leases. We retained the other original set. Upon leaving that morning, Mr. Owen told us their original set of the Kenyon Leases would be recorded as soon as his superiors reviewed them. He delivered us lease bonus checks drawn on Chesapeake's bank account around August 30, 2010.

* *Discovery of Fraudulent Kenyon Leases*

Over a year passed before we discovered that the recorded Kenyon Leases differed substantially from those we executed on July 30, 2010 and the set we retained that day. Our discovery came about in an unexpected way. During the first week of September, 2011, Elizabeth Bednar, a landman with EnerVest called us about leasing our Great Lakes lands. She also pointed out a discrepancy in the land description of the Kenyon Leases and that I could confirm that fact by viewing the Kenyon Leases filed with the Carroll County Recorder through its records link to the "LandAccess.com website". Prior to our conversation, I had never heard about that website or used that site to view the Carroll County official records.

When I [Michele] looked up the Kenyon leases on the Carroll County Records I was ***shocked*** to find both leases were not the originals that we had handed to Mr. Owen on July 30, 2010. Each had been changed in multiple places. Importantly, each filed Kenyon Lease included a 5 year extension option contrary to Page 2 which Kenyon or Mr. Owen had lined out and we had initialed.[3] The location of the 5 year extension was not even on the same page as our original set. Also, the pagination, margins, font size and paragraph spacing were different from the originals retained in our safe. There were even blanks for the state and county designations of the notary's acknowledgement of the 2nd recorded Kenyon Lease. Our retained original and even the 1st recorded Kenyon Lease had those spaces filled in.

* *Communication Efforts to Correct Kenyon Leases with:*
  *Messrs.': Owens; Phillip Lowery (President) and Dain Wise*
  *In Hopes of Avoiding Litigation*

I immediately called Mr. Owen about changes made to our July 30, 2010 Kenyon Leases, as well as the acreage error. He finally agreed to meet us in person in early November. But because he was then working in West Virginia he would in the meantime have another Kenyon landman named Nathaniel Hammons contact us. At the meeting in our house, we confronted Mr. Owen with the specific changes made in the recorded Kenyon Leases [which I copied from the

---

[3] We have attached copies of our original Kenyon Leases as **Exhibit A-1** and the wrongful Kenyon Leases filed with the Carroll County Recorder as **Exhibit A-2**.

[Summary of pleading] - 3

Carroll County Recorder's Website to show him] from those retained in our safe. His face turned beet red and left very quickly.

In continued follow-up calls, Mr. Owen refused to address, explain or correct the wrongful changes. Later he chose not to answer or return our telephone calls about the filed versions of our July 30, 2010 Kenyon Leases. We became frustrated and I called Mr. Lowry, Kenyon's president, at its address in North Canton in early December, 2011. He promised to get back to us – but never did. Attached as **Exhibit** B-1 is a true and correct copy of the letter we sent him.

I then tried to contact Kenyon's in-house counsel. Eventually, I spoke to Mr. Dain Wise and explained how the Kenyon Leases filed in the Carroll County records differed greatly from the leases we negotiated, signed and had notarized. Mr. Wise gave me his e-mail address and I e-mailed him about the changes in the recorded leases on December, 2011, but to no avail[4]. A true and correct copy of my email to him is attached as **Exhibit B-2**.

* *Left With No Alternative: State Court Litigation*

When we got no response about correcting and amending the recorded leases, other than the release of the one parcel, we decided to do what any natural person would do who knew they were being treated dishonestly and unfairly. We decided to seek a legal remedy, something we had never done. Michele talked to our neighbors and one neighbor in particular had a somewhat similar experience and recommended we talk to Attorney Ed Wright from New Philadelphia. He also had a lease with Kenyon and discovered that the filed one he found on "landaccess.com" was not the same as that which he and his wife had signed. Mr. Wright represented them in filing a state court lawsuit. We understand they settled right before trial. The settlement details were not filed with the court but newspaper articles picked up the story. In our efforts to find counsel to remedy the wrongs perpetrated upon us, it has appeared to us that few lawyers in Northeastern Ohio have had meaningful experience with oil and gas documents, laws and federal litigation that do not already have conflicts or other reasons for not representing landowners like us.

We employed Mr. Wright. He recommended and prepared a lawsuit for us to file in Ohio state court thinking it involved primarily state law issues as Kenyon Energy, L.L.C. was incorporated in Ohio and had its principal place of business here, our lands are located here, the subject leases were executed in the state and all people who, to our knowledge, dealt with them (landmen, notaries, Kenyon superiors, Mr. Owen etc.) live or primarily work in the state. In the midst of this, Mr. Wright who is older had knee surgery on both knees.

* *Counsel Edward Wright Inability to Practice in Federal Courts*

When the defendants first sought to remove our original state court case to federal court, Mr. Wright advised us he had not practiced in federal court in a number of years and didn't feel

---

[4] We have attached a copy of Michele's email to him as **Exhibit "B-2"**

[Summary of pleading] – 4

he could continue to represent us there. He wanted our approval for his contacting another attorney, Mr. Robert Soles, to get the case remanded back to state court. Mr. Wright spoke to Mr. Soles about adding Richard Owen to the case because in my research (Michele), I discovered that Mr. Owen and 5 other Kenyon employees/ landmen had stated they were permanent residents of Ohio in applications to become commissioned notaries in Ohio. In order to become a notary in Ohio anyone not an attorney has to be a *permanent resident* of the state[5].

- *Mr. Owen's Statement of His Being An Ohio Resident*
  *In his Ohio Notary Documents*

Given that information, the higher costs of federal court litigation and perhaps other considerations, Mr. Wright thought it best for Mr. Soles to dismiss our first case. A certified copy of Mr. Owen's Ohio application and Ohio Notary Certification are attached as **Exhibit C.** Based upon the information of Mr. Owen claiming he was an Ohio resident, Mr. Whitaker filed a second state court suit against Mr. Owen, Kenyon Energy and Chesapeake Exploration.

- *Mr. Owen's Affidavit Statement of His Being an Oklahoma Resident*

However, the Vorys, Slater et al law firm filed a pleading in July 2010 to "remove" the state court litigation to this Honorable Court because, as we have come to understand, we, the plaintiffs live in Ohio and all the defendants are supposedly "citizens" of other states. Thus, there is complete "diversity of jurisdiction" and this Honorable Court can hear the case that is, at its core, an Ohio matter. And in support of its removal pleading, Mr. Owen filed an Affidavit on July 6, 2012, stating he was not a resident of Ohio but instead was a resident of Oklahoma.[6] At that point Mr. Wright released himself from our case. We understood the Sholes firm was extremely busy working on another Chesapeake related litigation involving many parties and had little time for us.

- *Mr. Owen's Recent Statement of His Being a West Virginia*
  *Resident in his West Virginia Notary Documents*

Recently, I discovered that Mr. Owen filed documents in West Virginia in order to become a certified Notary in that state. In those documents he stated he was a resident of West Virginia.

### B. *Professional Relationship with Attorney Brendan Delay*

Not knowing what to do, we employed Mr. Brendan Delay from a recommendation of another neighbor, Roger and Carolyn Starkey, who employed him to sue Chesapeake for not discussing with or getting their approval [as required by their lease] prior to locating a well pad site in the middle of their best corn field. Mr. Delay had some initial success in that Columbiana

---

[5] The applicable forms, rules and procedures for becoming an Ohio notary are attached as **Exhibit D.**
[6] We have attached Mr. Owen's Affidavit as **Exhibit "E"**

00005

in the center of their biggest corn field. Mr. Delay enjoyed some early success in that Columbiana County lawsuit when he obtained a temporary restraining order and then an injunction order against Chesapeake. But thereafter the injunction was dissolved and recently Mr. Delay lost a jury trial in that Columbiana court to the Starkey's great dismay.

* *Initial Relationship With Attorney Delay*

Initially and through part of this past fall, we enjoyed a reasonable professional relationship with Mr. Delay. However, a number of things started to occur which caused us to question his commitment to us and his expertise and experience in federal court matters. In November our concerns greatly increased, particularly over his not having subpoenaed or taken the deposition of Mr. Owens, and not having served interrogatories and requests for document production upon Mr. Owens, Kenyon and Chesapeake. We learned about those procedures from those documents the Defendants served on us. Our growing inability to communicate with Mr. Delay, to timely review facts and documents with him, to receive from him pleadings filed with this Honorable Court and to understand the status and progress of our case caused our relationship to sour. Recently we have looked up the Ohio Rules of Professional Responsibility and as we will discuss later we believe Mr. Delay did not follow all of them in dealing with us.

* *Early On, We Requested Mr. Delay Use Mr. Owen's and other Kenyon*
   *LandMen's Notary Related Documents With Respect to Jurisdictional*
   *And Credibility Issues: Particularly the following:*
      *(a)Mr. Owens & Other Kenyon Landmen's Initial Use*
         *of Kenyon's Office Address on Notary Papers*
         *as their Personal Residential Address;*
      *(b) Then They Used the local "Residence Inn" as*
         *their Ohio Residential Address on their Notary Papers;*
      *(c)Recently Mr. Owen Stated on West Virginia Notary*
         *Papers that He is a West Virginia Resident; and*
      *(d) In his Affidavit toe This Honorable Court Last May,*
         *Mr. Owen Stated He Was an Oklahoma Resident.*

Important to us were the facts and documents we discovered about Mr. Owens and Kenyon's apparent practice of having its local landmen become notaries in Ohio based upon their *permanent residency here*[7], even if they were also claiming at the same time resident status in one or more other states or would use either a local motel or Kenyon's own office as their Ohio residential address. In those regards, we requested almost at the outset of our relationship that Mr. Delay submit our findings and supporting documents to your Honor.

---

[7] Ohio Revised Code Section 147.01 requires a non-attorney to be a legal resident of Ohio in order to qualify to become a notary public. ORC Section 147.02 (2) also requires an applicant to be citizen of the county in which he or she resides.

[Summary of pleading] - 6

00006

Through additional research, I discovered the following specific inconsistent acts and documents that call into question Mr. Owen's and Kenyon's credibility:

First, Mr. Owen and other Kenyon landman stated on their notary papers they were *permanent residents* of Ohio. We have attached certified copies of those Ohio notary documents as **Exhibit F**.

Second, Mr. Owens and other landmen used Kenyon Energy's office business address ("1425 S. Main St., North Canton, OH) as their own 'Ohio permanent residence address." I used that 1425 S. Main St. North Canton Ohio address to write Mr. Lowery [ its president ] and that is the Kenyon Energy address set forth in Mr. Owen's September 10, 2010 letter to us (a true and correct copy of which is **attached as Exhibit G**);

Third, Mr. Owen and Nathaniel Hammons [the Kenyon landman who Mr. Owen said would call us in October, 2011 about the unauthorized changes to our Kenyon Leases] subsequently changed their *permanent Ohio addresses* on their Ohio Notary Papers to 5280 Broadmoor Circle, North, Canton. As Mr. Owen stated in his Affidavit filed with this Honorable Court that happens to be the address of a local "Residence Inn".

Fourth, we also discovered that Mr. Owen applied and received his West *Virginia Notary certification on November 9, 2012 by stating he was also a resident* of West Virginia. A copy of those documents is attached as **Exhibit H**.

Thus, from September, 2010 through 2011 and into 2012, Mr. Owens practiced his land man business for Kenyon in Ohio based upon his being an *Ohio permanent resident*; in West Virginia based upon his being a *resident* of that state; and yet supposedly at the same time being a full time or permanent *resident* of Oklahoma according to his affidavit filed before this Honorable Court.

Given our farming background, we didn't then and still don't understand how those inconsistent actions are considered as either honest or forthright and how his affidavit can properly serve as a foundation of jurisdiction before your Honor.

We compiled a list of oil and gas leases which Mr. Owens notarized just for Carroll County, Ohio in 2011and which were filed of record based upon his being a *permanent Ohio resident*. A certified copy of several of those leases is attached as **Exhibit I-1**; we request this Honorable Court take notice of all of them.

Leading up to the most recent hearing before your Honor on December 17, 2012, we requested Mr. Delay [in repeated telephone calls and text messages] to file a pleading that included these "*permanent resident*" and other related documents. As part of that pleading we hoped Mr. Delay would point out how Mr. Owen's irregularities and inconsistencies demonstrate how, for jurisdictional purposes, his statements are unreliable and, in any event, how he is playing fast and loose with this Honorable Court – because at the time of his affidavit, he continued his valid Ohio Notary status in furtherance of his oil and gas leasing business. We

[Summary of pleading] - 7

thought Ohio notaries are to be honorable so they can be depended upon for verifying documents and people's identities.

In spite of our repeated requests made as recent as December 14, 2012, the Friday before the Monday, December 17th hearing before your Honor, Mr. Delay never did file any such pleading.[8]

- *Mr. Delay Failed to Conduct any Document Discovery of Defendants*

We are not sophisticated in the ways of litigation. Until this case we had never been in federal court. We were not familiar with "discovery" through requests for document and email production. We did not know what was expected of us or of our then attorney Mr. Delay. We assumed he would represent us fully and adequately before this Honorable Court, in a responsible and timely manner, keep us informed of the developments and effectively prosecute our case against the wrongs perpetrated upon us. And yet, we now know that Mr. Delay tendered no production requests of Mr. Owen, Kenyon Energy and Chesapeake – while over the same period of time, the Defendants tendered production requests and interrogatories of us.

- *Mr. Delay Failed to Take the Deposition of Mr. Owen;*
  *Did Not Timely Notify or Prepare Us for Our Depositions*

Neither Mark nor I had ever had our deposition taken before this case. With less than 48 hours' notice, my deposition (Michele) was taken on November 15th and Mark's deposition was taken on December 12th. Mr. Delay arrived at our house at 9:30pm on November 14, the day before my deposition. We spent the next 2 -2.5 hours finalizing our Answers to the Defendants' Interrogatories which were more than 40 days late in being answered. Mr. Delay originally arranged to be at our house around 5 pm.

Mr. Delay finally sought at 11:30 pm to prepare me for my deposition scheduled to take place in Akron the next morning at 9:00 am, an approximate 90 minute trip for us to an unfamiliar office.

*However, the most important discovery in our thinking us was for our attorney, Mr. Delay, to take the deposition of Mr. Owen. We requested him repeatedly to arrange for and take his deposition in telephone calls, emails and text messages.*

- Opposing Counsel Pointed Out to Us Mr. Delay's
  Tardey Attempts at Representing Our Interests.

At Mark's December 12th deposition we learned for the first time from Mr. McGranor's comments how late Mr. Delay was in filing our interrogatory answers and dealing with other case matters. Since the December 17th hearing, we reviewed the Defendants' two status reports [which Mr. Delay never sent us]. They point out several of his numerous delays.

_____

[8] Deleted

[Summary of pleading] - 8

In looking back, we realized Mr. Delay failed us in his first appearance representing us in front of your Honor at the August 21st "case management conference". We were *HORRIFIED* that Mr. Delay was both late to the hearing and was unprepared to answer his Honor's questions about our case. We subsequently learned that he had never reviewed our case documents-- even though he told me [Michele] 3 days before the hearing by telephone that he had received my document package. After the hearing, our package was, however, returned to us marked "undelivered."

In the package were copies of our original Kenyon Leases, the recorded Kenyon Leases, copies of all the paperwork pertaining to this case, evidence of differing amounts offered to us by Mr. Owen; copies of Mr. Owen's and 5 other Kenyon landmen's Ohio notary commissions.

In Mr. Owen's July 6 2012 Affidavit he stated that his LLC, RGOWEN & Assoc. LLC contracted with Kenyon to do land work and leasing. But that statement fails to point out that Mr. Owen did not incorporate the company until January, 2012, a year and half after negotiating our July 30, 2010 leases and over a year after becoming an Ohio notary based upon his being a *permanent resident of Ohio*.

Mr. Delay had all this information and certified copies of Mr. Owen's Ohio Notary Papers but failed to use them in any case discovery or even to depose Mr. Owen about his account of the Kenyon Leases' negotiations, different provisions, notarizations, telephone calls and meetings.

Leading up to the December 17th hearing we again requested Mr. Delay [in repeated telephone calls and text messages] to file these "resident" related documents and hopefully point out how Mr. Owen's irregularities and inconsistencies demonstrate how, for jurisdictional and other purposes, his statements are unreliable and, in any event, he is playing fast and loose with this Honorable Court. We thought Ohio Notaries are to be honorable so they can be depended upon in verifying documents and people's identities.

Altogether, Delay just ignored our requests.

- *Belief Mr. Delay's Inactions Were Prejudicial to Our Case.*

During November and into December, we came to believe Mr. Delay's inactions and other failures substantially prejudiced the merits of our case and the view of this Honorable Court toward it and us through no fault of our own. As a result, we attempted to locate and engage other counsel.

On December 12, 2012, the day of Mark's depositions, our suspicions were brought to light. Mr. McGranor stated that Mr. Delay had returned our answers to their interrogatories over 45 days late and he had not produced any documents until my November 15th deposition, when I volunteered my copies. Mr. Delay did not inform us about Mark's scheduled deposition until the previous day, December 11, while driving to Minerva for the deposition of the person who notarized our Kenyon Leases. Prior to that call, he hadn't even informed us of her deposition being taken. In retrospect it would have been more convenient for all parties to depose Mark at the same time of the bank notary in Minerva.

[Summary of pleading] - 9

00009

On Thursday December 13, I contacted the Clerk of Courts Office for the Akron Office of the Northern District of Ohio and spoke to Heidi, asking how I could enter our "Discovery", as to our side of the case in the record. I understood that all "discovery" had to be filed by midnight Friday, December 14. She put me on hold to speak either to your Honor or your law clerk. She said to file any such "Discovery" we would have to release our attorney and represent ourselves. I tried to get in touch with Mr. Delay both that Thursday and Friday, but to no avail. I left a Thursday voicemail stating I wanted to meet him at the Clerk of Courts office the next morning, in order to enter this information into the record before the cut-off time.

Our schedules presented their own issues. Mark had 2 MRI's scheduled for that Friday morning at Mercy Medical Hospital; so I made arrangements for a friend to pick him up when his procedures were done and bring him to Akron. Mr. Delay never returned my telephone calls or messages those two days as well on Saturday.

In early December, we determined to seek other counsel who had significant federal court litigation and some oil and gas experience. However, we didn't know any attorneys or firms that were not otherwise too busy or conflicted. An out of state attorney we had come across earlier sought to help us find suitable counsel. Although not knowing our case's details, he had a hunch that we made need new counsel because our case seemed to be suffering from my description of Mr. Delay's inattention. He researched and then contacted several firms. But they had conflicts, time restraints or other problems preventing their getting involved. Finally, he discovered and put us in touch with Mr. Hobson.

The next day, December 14th, Attorneys Hobson and Leiby briefly met with me while I was in Akron. They advised me they could not represent us until we released or terminated Mr. Delay and that with such short notice they could not realistically get up to speed on all important events, details, documents and the case itself and were doubtful they could effectively represent us at the Monday hearing due to such short notice and the lack of actions taken by Mr. Delay. Although Mr. Hobson ultimately agreed to appear before your Honor once the firm was free to represent us, he became sick over-night Sunday and Mr. Leiby substituted Monday morning, at the last moment.

I e-mailed Mr. Delay on Saturday, December 15, 2012 advising him that we had terminated him as our counsel and requesting him not to appear in court at Monday's hearing. We did not want Mr. Delay to be present at, represent us or be able to speak on our behalf at the hearing. We felt he would only try to color matters to his benefit.

At the hearing and after Mr. Leiby requested a continuance as our newly hired counsel Mr. Delay, to our bewilderment, took over the lectern. He then re-directed everyone's attention away from his failures and inactions to some settlement efforts of his that even Mr. McGranor was not really aware of. Mr. Delay did not advise us over the previous week-end of any such settlement discussions or the existence of a December 14th dated "settlement letter" and about which he spoke of to your Honor. He only handed a copy of it to us shortly before the hearing[9].

---

While claiming he had already mailed the December 14th to us on the 14th—the copy we eventually received had a December 17th post mark.

[Summary of pleading] – 10

We felt ambushed by Mr. Delay and his attempt to force a settlement upon us, regardless of its contents or its effect upon our Original Kenyon Leases or the fraudulent Kenyon Leases filed in Carroll County. As we will discuss shortly, the proposed settlement offered us an outcome worse than if we accepted the fraudulent Kenyon Leases and never brought this lawsuit. It would also prevent us from defending our reputation in the community; discussing the merits and outcome of this litigation anyone other than our attorneys, including commenting to the State Bar Association or our neighbors about our litigation experience with Mr. Delay[10]

### C. Settlement Documents; Significant Downside For Us; Necessary Parties to Resolve Issues; Lack of Jurisdiction Due to Lease Arbitration Clause and/or Diversity Issues

The week before our last hearing on December 17, 2012 before your Honor was very stressful on a number of fronts. With respect to this case, the Defendants took the deposition of my husband, Mark Fritz, on Wednesday, December 12th. As previously pointed out, did not receive notice of its being scheduled but approximately 24 hours in advance. We had requested Mr. Delay have the deposition taken of Mark in Minerva or Carrollton to minimize the time away from the farm and to avoid extra travel to Akron. Mr. Delay initially agreed the December 11th morning – so I arranged for a deposition place in Carrollton – only to have Mr. Delay agree to its being taken the next morning in Akron- and lying to me the same day of his earlier agreement.

We were also very much concerned over Mr. Delay's not have taken Mr. Owen's deposition in spite of our numerous reminders and requests to do so and our fear that a failure to do so before the December 17th hearing would pose problems. I also was concerned that Mr. Delay had not undertaken other discovery of the Defendants and that we may be barred from submitting evidence or my "discovery" of Mr. Owen's continuing Ohio Notary status based upon his being a *permanent Ohio resident* and his affidavit to your honor that he was a *permanent resident of Oklahoma* in spite of his continuing to live in Ohio hotel/motels and doing land man work for Kenyon here and in West Virginia.

When Mr. Delay did not return any of my telephone calls or text messages from Wednesday of that week onward to December 17th, I decide to try to accomplish the equivalent by contacting the District Court's Clerk's Office about how to file "discovery"—my name for all the documents concerning Mr. Owens and Kenyon Energy's notary practices, among others. That proved unfeasible given the distances involved, my lack of knowledge of the appropriate methods and procedures; time constraints; our desire to employ new counsel who could and would represent our interests fully; and, as it turned out, my need to terminate Mr. Delay's employment via email instead of my mail or a meeting.

---

[10] We have summarized those matters in Exhibit J.

00011

On top of those issues, I was concerned over my husband's severely degenerative arthritic lower back, his MRIs scheduled for that Friday and his recent epidurals which had produced no real improvement for him.

Over the Saturday and Sunday proceeding December 17th, I sent Mr. Delay an email message terminating his employment/representation of us and requesting him not to attend Monday's hearing; sought to finalize the employment of the Leiby firm to represent us going forward; and to prepare for the hearing before your honor. Mr. Delay never called us that week-end to discuss our dissatisfaction and termination of his services; what happened after Mark's deposition on December 12th; were there any settlement developments; and what would occur at Monday's hearing – something we expected would occur. Instead we heard nothing from Mr. Delay until Monday morning outside your Honor's Courtroom when he handed us a letter dated the previous Friday, December 14th and from which he read to his Honor. As we previously said, Mr. Delays seizing the lectern and averting all issues leading up and concerning our termination of his services surprised us. And what happened afterwards bewildered us to the point of our being terribly disappointed and exhausted with everything.

Once we returned home, collected our senses and viewed the proposed documentation submitted to us by Chesapeake we came to the only conclusion possible that we were again being taken advantaged up. The terms and provisions of the settlement proved worse not only than our Original Kenyon Leases but also the fraudulent ones filed in Carroll County.

* Under our Original Kenyon Leases, if Kenyon, Chesapeake or a successor lessee did not drill a well within the 5 year primary term, the leases were terminated for all purposes.

* Under the fraudulent Kenyon Leases, if Kenyon, Chesapeake or a successor lessee did not drill a well within the 5 year primary term, the leases could be renewed for an additional five year period provided we were paid the same lease bonus we received upon signing the leases in July, 2010.

### * 5 Year Primary Term Extended to 7 Years

*Under the proposed Settlement, if Kenyon, Chesapeake or a successor lessee did not drill a well within the 5 year primary term, the leases would not terminate and we would not have to be paid another lease bonus; instead the proposed language extends the primary term another two years. So, instead of having a 5 year initial primary term, Chesapeake proposes we accept an additional 2 years. If that was what your Honor thought we agreed to on December 17th, the terminology and understanding of the contractual effect became mixed—and we did not intend to agree to that result and we will not agree to it upon needed reflection. To accept that result, we would be worse off than we were before we filed this suit.*

- *Amended (and restated) Lease and Ratification Agreement Proposed*

[Summary of pleading] - 12

*Additionally Chesapeake insists that we execute an Amended Lease and a Ratification type document a <u>ratification agreement was not discussed</u> to our knowledge in court on the 17th. And <u>we did not agree</u> to a ratification agreement and certainly not of the sort proposed recently by Chesapeake.*

- **Amended Lease and Ratification Agreement Creates New Right for Chesapeake to Drill for and Use Water from our Lands**

*Further, Chesapeake has included provisions in the Amended Lease and Ratification Agreement that permits it, for the first time, to drill and use water from our lands. Again, to our knowledge <u>no right to drill and use water from our lands was discussed</u> in court on the 17th. And <u>we did not agree</u> to it.*

- **The Ratification Agreement Includes CHK Utica and Total US E &P as Signees- When They are not Parties to this Case**

*Chesapeake's proposed <u>Ratification Agreement</u> also provides for CHK Utica, LLC and TOTAL U.S. E & P, LLC <u>be included as named lease signees.</u> We have signed no agreement with either of those entities and, at this moment, they are not parties to this proceeding, even though upon our review of the Carroll County Records, they are probably needed to resolve the issues presented by our complaint.*

- *Review of Carroll County Records in Light of Amended Lease & Ratification Agreement Shows Beldon & Blake, an Ohio Corporation, is an Owner Of Our Lease Which Under 28 USC 1332 Destroys Diversity*

Chesapeake's proposed Amended Lease and Ratification Agreement's inclusion of CHK Utica, LLC and Total US E& P as newly named parties caused us to review the Carroll County Records which show that Kenyon and Chesapeake Energy conveyed either all or virtually all their ownership interests in our Kenyon Leases to CHK Utica, LLC; Total US E&P, CGas Properties, LP and **Belden & Blake Corporation** pursuant to Assignments, Bill of Sale and Conveyances dated to be effective either as of November 1, 2011. Those assignments were recorded in Volume 77-Page 646; Volume 82-Page 2502 of the Carroll County Records. Since Beldon & Blake was an effective owner of our Kenyon Leases as of November 1, 2011, their being a necessary party to resolve the title, ownership, terms and provisions of our Kenyon Leases would destroy the Honorable Court's diversity of jurisdiction. The proposed Settlement Agreements are attached as **Exhibit K.**

- **Lack of Jurisdiction Due to Kenyon Leases' Arbitration Provisions**

**Your Honor, we re-read the July 30, 2010 Kenyon Leases we signed and also the ones filed in Carroll County as part of review of the proposed Settlement Agreement documents – to which we do not and cannot agree for among other reasons those stated in this letter. In doing so, we happened upon ARBITRATION PROVISIONS IN EACH**

00013

LEASE WHICH REQUIRE ARBITRATION OF ANY DISPUTE OF THE LEASE TERMS AND PERFORMANCE, AS FOLLOWS:

"ARBITRATION: In the event of disagreement between Lessor and Lessee concerning this Lease ......., the resolution of all such disputes shall be determined by arbitration in accordance with rules of the American Arbitration Association. Arbitration shall be the exclusive remedy and cover all disputes, including but not limited to, the formation, execution, validity and performance of the Lease and Order of Payment."

Thus, in conclusion, we respectively request this Honorable Court to recognize that the proposed settlement documents do not encompass or require our agreement; that because of the aforementioned stress, change of circumstances, twilight zone of our being between counsel, and the terms of the settlement agreement being to our disadvantage, we did not settle on those grounds and do not agree to settle with Mr. Owen, Chesapeake and Kenyon Energy. Further, we believe this Honorable Court's Jurisdiction is not effective due to either other parties, including a Ohio corporation (as opposed to a limited liability company) [Belden & Blake] being a necessary party to resolve all disputes involving the Kenyon Lease and further and finally because the Kenyon Leases include clauses that require Arbitration to resolve lease disputes like the instant ones. Had Mr. Delay informed us of those arbitration provisions we would not have brought this action.

Sincerely Yours,

*Mark R. Fritz*

*Michele C. Fritz*

Fritz Dairy Farm, L.L.C.
Mark R. & Michele E. Fritz
6301 Mackel Rd. N.E.
Minerva, Ohio 44657

Cc:   We are mailing a copy of this letter and all attachments today, Tuesday, January 14, 2012 via first class mail to:

Mr. Graynor, Vorys, Slater, Seymour, 52 East Gay Street, PO Box 1008, Columbus, Ohio;
Mr. Brandon Delay, 24500 Center Ridge Road, Suite 160, West Lake, Ohio 44145; and to
Mr. Steven Leiby, 388 S. Main Street, Suite 402, Akron, Ohio.44311

[Summary of pleading] - 14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32

[Summary of pleading] - 15

00015

# INDEX 8

## DOC #27  CONVEYANCES

Instrument
201100007779 DR

Book  Page
77  746



NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU
MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS
INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR
SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

### AMENDED AND RESTATED
### ASSIGNMENT, BILL OF SALE AND CONVEYANCE

STATE OF OHIO           §

COUNTY OF CARROLL       §

201100007779
Filed for Record in
CARROLL COUNTY, OHIO
PATRICIA J. OYER, RECORDER
12-08-2011 At 01:36 pa.
ASSIGN LEAS   18508.00
OR Book    77  Page  746 - 1225

THIS AMENDED AND RESTATED ASSIGNMENT, BILL OF SALE AND
CONVEYANCE (this "**Assignment**"), dated effective as of November 1, 2011 at 7:00 a.m.
Central Time (the "**Effective Time**"), is made by **CHESAPEAKE EXPLORATION, L.L.C.**,
an Oklahoma limited liability company, **CHESAPEAKE APPALACHIA, L.L.C.**, an
Oklahoma limited liability company, **CHESAPEAKE AEC ACQUISITION, L.L.C.**, an
Oklahoma limited liability company, and **OHIO BUCKEYE ENERGY, L.L.C.**, an Ohio
limited liability company (collectively, "**Assignor**") to **CHK UTICA, L.L.C.**, a Delaware
limited liability company ("**Assignee**"). This Assignment is executed and delivered in
connection with and pursuant to the terms of that certain Contribution Agreement between
Assignor and Assignee dated November 1, 2011 (as amended, the "**Contribution
Agreement**"), and modifies, amends, restates and replaces, without duplication, the Prior
Assignment (as defined in Section 6.5 below). Capitalized terms used and not otherwise defined herein shall
have the meanings assigned to such terms in the Contribution Agreement.

1.      Assignment.  For and in consideration of Ten Dollars ($10.00) and other good and
valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor
does hereby **GRANT, BARGAIN, SELL, CONVEY, ASSIGN, TRANSFER, SET OVER,
AND DELIVER** unto Assignee, an undivided seventy-two percent (72%) (the "**Conveyed
Interests**") of all of Assignor's interest in and to the following, subject to the terms and
reservations hereof and specifically, **LESS AND EXCEPT** the Excluded Assets (as hereinafter
defined) (the "**Properties**"):

1.1      (i) all oil and gas leases, leasehold interests, operating rights, working interests,
net revenue interests and similar operating interests, or other rights to Hydrocarbons (whether
producing or non-producing), described in Exhibit "A" attached hereto, in each case, as to all
depths (collectively, all of the foregoing, the "**Leases**"); (ii) the lands covered by the Leases and
all lands pooled or unitized therewith (collectively, the "**Lands**"); and (iii) all expressed or
implied rights-of-way, easements and other surface rights, insofar and only insofar as the same
arise in or under the Leases (collectively, the "**Easements**"; and the interests described in
subparts 1.1(i)-1.1(iii) are collectively referred to as the "**Real Property Interests**");

1.2      (i) all of the wells listed on Exhibit "A" drilled and completed in the Utica Shale
Formation or currently being drilled to the Utica Shale Formation (the "**Wells**"), (ii) all Lease
Owned well heads, casing, tubing, pumps, motors, gauges, valves, heaters and treaters
constituting part of or connected to the Wells, (iii) all Lease Owned automation equipment
constituting part of or connected to the Wells, (iv) all Lease Owned gathering lines and
improvements, water lines, vessels, tanks, boilers, separators, treating equipment, fixtures,
compressors and other equipment used in connection with the Wells, (v) all Lease Owned power
lines, telephone and communication lines used in connection with the Wells, (vi) all Lease
Owned injection wells and water disposal facilities used in connection with the Wells, (vii) all
other Lease Owned appurtenances owned and used in connection with the production, treating,
storing, transportation or marketing of Hydrocarbons from the Wells, and (viii) any and all other
equipment, machinery, fixtures and other tangible personal property and improvements located
on or used in connection with the operation of the Wells (collectively referred to as the
"**Equipment**");

1.3      all presently existing unitization, pooling and/or communitization agreements,
declarations or designations and contractually, statutorily, judicially or administratively created
drilling, spacing and/or production units, insofar as the same are attributable or allocated to the

1

Real Property Interests or the Wells, and all of the Assignor's interest in and to the properties covered or units created thereby which are attributable to the Real Property Interests or the Wells;

1.4    all presently existing and valid Hydrocarbon sales agreements, operating agreements (excluding any operating rights or duties), gathering agreements, transportation agreements, farmout and farmin agreements, participation agreements, unitization, pooling and communitization agreements, purchase agreements, exploration agreements, area of mutual interest agreements, exchange and processing contracts and agreements and any other contracts, agreements and instruments insofar as the above agreements cover, are attributable to or relate to the Real Property Interests or the Wells, Equipment or any interests pooled, communitized or unitized therewith, including those contracts and agreements described in the Contribution Agreement;

1.5    all Hydrocarbons in, on, under or produced from or attributable to the Wells and the proceeds thereof; and

1.6    copies of the Records to the extent relating to the Properties described in the foregoing subsections (1.1) through (1.5).

It is the intent of Assignor to convey and this Assignment hereby conveys to Assignee, subject to the reservations and conditions herein contained, from and after the Effective Time, the Conveyed Interests, regardless of the omission of any lease or leases, errors in description, any incorrect or misspelled names, or any transcribed or incorrect recording references.

TO HAVE AND TO HOLD all and singular such Conveyed Interests together with all rights, titles, interests, estates, remedies, powers, and privileges thereunto appertaining unto Assignee and Assignee's successors and assigns forever; subject to the following matters:

a.    (A) with respect to any Leases and other leasehold interests: royalties and overriding royalties, and (B) with respect to Wells: royalties, overriding royalties and other burdens or encumbrances to the extent they do not, individually or in the aggregate, increase Assignor's Working Interest (without at least a proportionate corresponding increase in Assignor's Net Revenue Interest) in any Well from that described in the Contribution Agreement;

b.    Liens for Taxes for which payment is not due or which are being contested in good faith by appropriate proceedings;

c.    Liens (other than Liens in favor of Assignor or its Affiliates) of mechanics, materialmen, warehousemen, landlords, vendors, and carriers and any similar Liens (other than Liens in favor of Assignor or its Affiliates) arising by operation of Law which, in each instance, arise in the ordinary course, for sums not yet due or which are being contested in good faith by appropriate proceedings;

d.    Liens (other than Liens in favor of Assignor or its Affiliates) under operating agreements, unit agreements, unitization and pooling designations and declarations, gathering and transportation agreements, processing agreements, Hydrocarbon purchase contracts and all of the other Contracts,

e.    easements, surface leases, and other rights and plat restrictions, zoning laws, restrictive covenants and conditions, and building and other land use laws and similar encumbrances, insofar as the same do not materially interfere with the operation, development or use of the affected Property;

f.    all rights to consent by, required notices to, filings with or other actions by Governmental Authorities in connection with the sale, disposition, transfer or conveyance of federal, state, tribal or other governmental oil and gas leases or interests therein or related thereto, which are customarily obtained subsequent to the assignment, disposition or transfer of such oil and gas leases or interests therein, or such operations;

g.    conventional rights of reassignment obligating the lessee to reassign or offer to reassign its interests in any lease prior to a release or abandonment of such lease;

2

00158

h.  required non-governmental Third Party consents to assignments which have been obtained or waived by the appropriate parties or which need not be obtained prior to an assignment or which cannot be unreasonably withheld, and preferential rights to purchase which have been waived by the appropriate parties or for which the time period for asserting such rights has expired without the exercise of such rights;

i.  all defects or irregularities (A) arising out of lack of affirmative statement of corporate authorization or a variation in corporate name, (B) that have been cured or remedied by applicable statutes of limitation or statutes for prescription, (C) consisting of the failure to recite marital status in documents or omissions of heirship proceedings, (D) that have been cured by possession under applicable statutes of limitation, or (E) resulting from lack of survey or failure to record releases of liens, production payments or mortgages that have expired by their own terms or the enforcement of which are barred by applicable statutes of limitation;

j.  rights vested in or reserved to any Governmental Authority to regulate the Properties, to terminate any right, power, franchise, license or permit afforded by such Governmental Authority, or to condemn, expropriate or designate a buyer of any of the Properties;

k.  any provision in a Lease, surface lease, easement, or other surface use agreement entered into prior to the Effective Time providing a Third Party with rights to an overriding royalty interest or other burdens or payments triggered by the use of the relevant surface property for drilling or other purposes (each a "Surface Use Burden"), *provided that*, with respect to the Wells only, such Surface Use Burdens do not reduce Assignor's Net Revenue Interest in such Well from that described in the Contribution Agreement;

l.  the Royalty Agreement and any and all obligations thereunder and rights created thereby or pursuant thereto; and

m.  the Contribution Agreement.

2.  Excluded Assets.  Assignor specifically excepts from this Assignment and reserves unto itself the following (the "Excluded Assets"):

2.1  Assignor's minute books, financial and income tax records and legal records (other than title records);

2.2  any existing or future refund of costs, Taxes or expenses borne by Assignor, any Affiliates of Assignor, or its predecessors in title attributable to the period prior to the Effective Time;

2.3  any and all proceeds from the settlements of contract disputes insofar as said proceeds are attributable to periods of time prior to the Effective Time;

2.4  all rights and interests of Assignor or any Affiliates of Assignor under (i) any policy, bond or agreement of insurance or indemnity (including any rights, claims or causes of action of Assignor against Third Parties under any indemnities or hold harmless agreements and any indemnities received in connection with Assignor's or any of its Affiliates' prior acquisition of any of the Properties), to the extent and only to the extent such rights and interests relate to the ownership of the Properties prior to the Effective Time and (ii) under any bond;

2.5  all of Assignor's and its Affiliates' proprietary computer software, patents, trade secrets, copyrights, names, trademarks, logos, and other intellectual property;

2.6  all accounts receivable and audit rights arising under any of the applicable contracts or otherwise with respect to any of the other items included in this definition of Excluded Assets, to the extent and only to the extent such rights and interests related to the ownership of the Properties prior to the Effective Time;

2.7  Geological and Geophysical Information and any other information which Assignor is prohibited from sharing by agreement with a Third Party;

2.8  (A) all mineral fee interests owned by Assignor or any of its Affiliates, (B) all royalty interests and overriding royalty interests owned by Assignor or any of its Affiliates and

3

00159

Instrument              Book Page
201100007779 OR         77  749

(C) any wellbores located on the Properties, other than the Wells and Lease-Owned water or disposal wells;

    2.9     all claims of Assignor or any of its Affiliates for refunds of or loss carry forwards with respect to (A) any other Taxes attributable to any period prior to the Effective Time, (B) income or franchise Taxes or (C) any Taxes attributable to any of the other items included in this definition of the Excluded Assets;

    2.10     all "virtual courthouses" of Assignor or any of its Affiliates, all of their respective exclusive use arrangements with title abstract facilities, and all documents and instruments of Assignor or any of its Affiliates that may be protected by an attorney-client privilege, and all data that cannot be disclosed to Assignee or its members as a result of confidentiality arrangements under agreements with Third Parties (other than title opinions and other title records relating to the Properties);

    2.11     all surface fee interests (but excluding the Easements), surface leasehold and other surface property interests (but excluding the Easements) and all buildings, offices, improvements, appurtenances, field offices and yards;

    2.12     non-Lease Owned equipment such as compressors on the wellheads of the Wells operated by Assignor or its Affiliates owned by or leased from Assignor, its Affiliates or Third Parties;

    2.13     automation systems including meters and related telemetry, licensed radio frequencies and associated communications infrastructure including towers, antennas, data links and network circuits, except any Lease Owned equipment;

    2.14     all drilling rigs and related equipment, work over rigs and related equipment, tools and other equipment brought onto a well site temporarily for purposes of drilling, reworking or maintaining a well, all vehicles, and any other non-Lease Owned equipment, inventory, machinery, tools and other personal property not currently in use for the operation of a well or wells;

    2.15     all assets of Chesapeake Midstream Group and all of the assets of Chesapeake Oilfield Group;

    2.16     all non-Leased Owned salt water disposal wells, systems and related equipment; and

    2.17     all of the Contributors' retained right, title and interest in and to the Properties after their contributions to the Company of the Conveyed Interests in accordance with the terms hereof and the Contribution Agreement.

3.     Contribution Agreement and Development Agreement. (i) The Conveyed Interests are subject to the terms of that certain Development Agreement between Chesapeake Exploration, L.L.C. and Assignee dated as of even date with the Contribution Agreement, and (ii) this Assignment is made expressly subject to the terms and provisions of the Contribution Agreement, including, without limitation, (A) certain limited remedies provided therein related to the general warranty provided below, (B) the assumption by Assignee of the Assumed Obligations (as defined therein), and (C) the retention by Assignor of the Retained Liabilities (as defined therein).

4.     General Warranty of Title. Assignor does hereby bind itself and its successors and assigns to warrant and forever defend all and singular title conveyed as of the date hereof to the Conveyed Interests unto Assignee and Assignee's successors and assigns, against every Person whomsoever lawfully claiming or to claim the same or any part thereof. Further, Assignee is specifically assigned, and subrogated to, warranties of title which Assignor may have from Assignor's predecessors in interest (other than Affiliates of Assignor) to the extent applicable with respect to the Conveyed Interests and to the extent Assignor may legally assign such rights and grant such subrogation.

00160

| Instrument | Book | Page |
|---|---|---|
| 201100007779 OR | 77 | 750 |

5.    Limitations on Representations and Warranties.

5.1    EXCEPT FOR THE EXPRESS AND SPECIFIC REPRESENTATIONS AND WARRANTIES OF ASSIGNOR IN THE CONTRIBUTION AGREEMENT, IN ANY OTHER TRANSACTION DOCUMENTS, AND EXCEPT FOR THE GENERAL WARRANTY OF TITLE CONTAINED IN THIS ASSIGNMENT, ASSIGNEE ACKNOWLEDGES THAT ASSIGNOR HAS NOT MADE, AND ASSIGNOR HEREBY EXPRESSLY DISCLAIMS AND NEGATES, AND ASSIGNEE HEREBY EXPRESSLY WAIVES, ANY OTHER REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE, INCLUDING THOSE RELATING TO (a) PRODUCTION RATES, RECOMPLETION OPPORTUNITIES, DECLINE RATES, GAS BALANCING INFORMATION, OR THE QUALITY, QUANTITY OR VOLUME OF THE RESERVES OF HYDROCARBONS, IF ANY, ATTRIBUTABLE TO THE PROPERTIES OR ASSIGNOR'S INTEREST THEREIN, (b) THE ACCURACY, COMPLETENESS OR MATERIALITY OF ANY RECORDS, INFORMATION, DATA OR OTHER MATERIALS (WRITTEN OR ORAL) NOW, HERETOFORE OR HEREAFTER FURNISHED TO ASSIGNEE BY OR ON BEHALF OF ASSIGNOR, AND (c) THE ENVIRONMENTAL OR OTHER CONDITION OF THE PROPERTIES.

5.2    EXCEPT FOR THE EXPRESS AND SPECIFIC REPRESENTATIONS AND WARRANTIES OF ASSIGNOR IN THE CONTRIBUTION AGREEMENT, ANY OTHER TRANSACTION DOCUMENTS, AND EXCEPT FOR THE GENERAL WARRANTY OF TITLE CONTAINED IN THIS ASSIGNMENT, AND WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, ASSIGNOR EXPRESSLY DISCLAIMS AND NEGATES, AND ASSIGNEE HEREBY WAIVES, AS TO PERSONAL PROPERTY, EQUIPMENT, INVENTORY, MACHINERY AND FIXTURES CONSTITUTING A PART OF THE PROPERTIES (a) ANY IMPLIED OR EXPRESS WARRANTY OF MERCHANTABILITY, (b) ANY IMPLIED OR EXPRESS WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, (c) ANY IMPLIED OR EXPRESS WARRANTY OF CONFORMITY TO MODELS OR SAMPLES OF MATERIALS, (d) ANY IMPLIED OR EXPRESS WARRANTY OF FREEDOM FROM DEFECTS, WHETHER KNOWN OR UNKNOWN, (e) ANY AND ALL IMPLIED WARRANTIES EXISTING UNDER APPLICABLE LAW, AND (f) ANY IMPLIED OR EXPRESS WARRANTY REGARDING ENVIRONMENTAL LAWS, THE RELEASE OF SUBSTANCES, WASTES OR MATERIALS INTO THE ENVIRONMENT, OR PROTECTION OF THE ENVIRONMENT OR HEALTH, IT BEING THE EXPRESS INTENTION OF ASSIGNEE AND ASSIGNOR THAT, EXCEPT AS SET FORTH IN THE CONTRIBUTION AGREEMENT, ANY OTHER TRANSACTION DOCUMENTS, AND EXCEPT FOR THE GENERAL WARRANTY OF TITLE CONTAINED IN THIS ASSIGNMENT, THE PERSONAL PROPERTY, EQUIPMENT, INVENTORY, MACHINERY AND FIXTURES IN WHICH ASSIGNOR HAS ANY INTEREST ARE BEING ACCEPTED BY ASSIGNEE, "AS IS, WHERE IS, WITH ALL FAULTS" AND IN THEIR PRESENT CONDITION AND STATE OF REPAIR.

5.3    ASSIGNOR AND ASSIGNEE AGREE THAT, TO THE EXTENT REQUIRED BY APPLICABLE LAW TO BE EFFECTIVE, THE DISCLAIMERS OF CERTAIN WARRANTIES CONTAINED IN THIS SECTION 5 ARE "CONSPICUOUS" DISCLAIMERS FOR THE PURPOSES OF ANY APPLICABLE LAW, RULE OR ORDER.

6.    Miscellaneous.

6.1.    Cooperation. In addition to this Assignment, Assignor shall execute, acknowledge, and deliver to Assignee, in a timely manner and without further consideration, any documents or instruments that Assignee may reasonably require, including, without limitation, further assignments or conveyances required by any state or federal authority, deeds, and consents to further evidence the assignment and conveyance of the Conveyed Interests by Assignor to Assignee.

6.2.    Choice of Law. This Assignment will be interpreted, construed, and enforced in accordance with the laws of the State of Ohio, without giving effect to any rules or principles of conflicts of law that might otherwise refer to the laws of another jurisdiction.

5

00161

EXHIBIT "A"

Attached to and made a part of that certain Assignment, Bill of Sale and Conveyance dated effective November 1, 2011 from Chesapeake Exploration, L.L.C., Chesapeake Appalachia, L.L.C., Chesapeake AEZ Acquisition, L.L.C., and Ohio Buckeye Energy, L.L.C., as Assignor to CHK utica, L.L.C., as Assignee

| Lease Number | Lessor | Lessee | Lease Date | Township | Book | Page | Instrument | County | State |
|---|---|---|---|---|---|---|---|---|---|
| 34-000117-000 | LEONARD A. LATTIN AND VERONICA S. LATTIN, HUSBAND AND WIFE | KENYON ENERGY, LLC | 7/14/2010 | PERRY | 61 | 2353 | 201000000699 | CARROLL | OH |
| 34-000119-000 | RICHARD I. TOALSTON AND LAURA TOALSTON, HUSBAND AND WIFE | KENYON ENERGY LLC | 6/5/2010 | EAST | 61 | 5578 | 2010000002313 | CARROLL | OH |
| 34-000124-000 | LONNIE D. LUCAS AND JENNIFER M. LUCAS, HUSBAND AND WIFE | KENYON ENERGY LLC | 7/24/2010 | CENTER | 61 | 2359 | 2010000002700 | CARROLL | OH |
| 34-000126-000 | MARK K. FRITZ AND MICHELLE E. FRITZ, HUSBAND AND WIFE | KENYON ENERGY, LLC | 7/27/2010 | AUGUSTA | 62 | 176 | 2010000002896 | CARROLL | OH |
| 34-000127-000 | FRITZ DAIRY FARMS, LLC | KENYON ENERGY, LLC | 7/27/2010 | AUGUSTA / WASHINGTON | 62 | 363 | 2010000002894 | CARROLL | OH |
| 34-000131-000 | WARREN H. WEPLER, A SINGLE MAN | KENYON ENERGY, LLC | 5/17/2010 | AUGUSTA | 60 | 3515 | 2010000001864 | CARROLL | OH |
| 34-000136-000 | JERRY G. LEGGETT AND MILDRED M. LEGGETT, HUSBAND AND WIFE | KENYON ENERGY LLC | 6/16/2010 | PERRY | 61 | 2376 | 2010000002703 | CARROLL | OH |
| 34-000143-000 | RAYMOND F. HAYLEY AND SHIRLEY M. HAYLEY, HUSBAND AND WIFE | OHIO BUCKEYE ENERGY, L.L.G. | 8/23/2010 | PERRY | 62 | 1826 | 2010000003253 | CARROLL | OH |

Page 269

Instrument        Book  Page
201100007779 OR      77   751

6.3.    Successors and Assigns. This Assignment shall bind and inure to the benefit of Assignor and Assignee and their respective successors and assigns.

6.4.    Counterparts. This Assignment may be executed in multiple counterparts, each of which will be an original instrument, but all of which will constitute one assignment

6.5.    Effect of Amendment and Restatement. This Amended and Restated Assignment, Bill of Sale and Conveyance modifies, amends, restates and replaces, without duplication, that certain Assignment, Bill of Sale and Conveyance from Assignor to and in favor of Assignee signed November 1, 2011 (the "**Prior Assignment**") that was filed of record under Document No. 201100007432 in Volume 76 at Page 3827 of the deed records of Carroll County, Ohio.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK
SIGNATURE PAGES FOLLOW]

6

```
Instrument              Book Page
201100007779 OR          77  752
```

IN WITNESS WHEREOF, Assignor has executed this instrument on the date of the acknowledgment annexed hereto, but effective for all purposes as of the Effective Time.

## ASSIGNOR:

**CHESAPEAKE EXPLORATION, L.L.C.,**
an Oklahoma limited liability company

By: _____
Douglas J. Jacobson
Executive Vice President

**CHESAPEAKE APPALACHIA, L.L.C.,**
an Oklahoma limited liability company

By: _____
Douglas J. Jacobson
Executive Vice President

**CHESAPEAKE AEC ACQUISITION, L.L.C.,**
an Oklahoma limited liability company

By: _____
Douglas J. Jacobson
Executive Vice President

**OHIO BUCKEYE ENERGY, L.L.C.,**
an Ohio limited liability company

By: _____
Douglas J. Jacobson
Executive Vice President

## ASSIGNOR ACKNOWLEDGMENT

STATE OF OKLAHOMA          §
                           §
COUNTY OF OKLAHOMA         §

The foregoing instrument was acknowledged before me this December 2, 2011 by Douglas J. Jacobson, Executive Vice President of Chesapeake Exploration, L.L.C., an Oklahoma limited liability company, Chesapeake Appalachia, L.L.C., an Oklahoma limited liability company, Chesapeake AEC Acquisition, L.L.C., an Oklahoma limited liability company and Ohio Buckeye Energy, L.L.C., an Ohio limited liability company, on behalf of said limited liability companies.

_____
Notary Public

My Commission Expires: 6-11-15
Commission Number: 03008905

LINN D. YOUSEY
NOTARY
# 03008905
EXP. 09/11/15
PUBLIC
STATE OF OKLAHOMA

00163

Instrument          Book Page
201100007779 OR       77  753

IN WITNESS WHEREOF, Assignee has executed this instrument on the date of the acknowledgment annexed hereto, but effective for all purposes as of the Effective Time.

**ASSIGNEE:**

**CHK UTICA, L.L.C.,**
a Delaware limited liability company

By: CHESAPEAKE EXPLORTION, L.L.C.,
    its sole managing member

By: _____
    Douglas J. Jacobson
    Executive Vice President

## ASSIGNEE ACKNOWLEDGMENT

STATE OF OKLAHOMA          §
                           §
COUNTY OF OKLAHOMA         §

The foregoing instrument was acknowledged before me this December 2, 2011 by Douglas J. Jacobson, Executive Vice President of Chesapeake Exploration, L.L.C., an Oklahoma limited liability company, the sole managing member of CHK Utica, L.L.C., a Delaware limited liability company, on behalf of said limited liability company.

_____
Notary Public

My Commission Expires: 6-11-15
Commission Number: 03008905

LINN D. YOUSEY
NOTARY
# 03008905
EXP. 06/11/15
PUBLIC
STATE OF OKLAHOMA

This instrument was prepared by
CHK Utica, L.L.C.
6100 N. Western Avenue
Oklahoma City, OK 73118

00164

Instrument
201100007779 DR      Book Page
77  754

Case: 5:12-cv-01736-JRA  Doc #: 27  Filed: 03/08/13  165 of 182.  PageID #: 403

Exhibit "A"

Attached to and made a part of that certain Assignment, Bill of Sale and Conveyance dated effective November 1, 2011 from Chesapeake Exploration, L.L.C., Chesapeake Appalachia, L.L.C., Chesapeake AEC Acquisition, L.L.C., and Ohio Buckeye Energy, L.L.C., as Assignor to CHK Utica, L.L.C., as Assignee.

| Property Number | Well Name | Location | County | State | API # |
|---|---|---|---|---|---|
| 833636 | Bailey 35-12-4 6H | 35-12N-4W | Carroll | OH | 3401922089 |
| 833124 | Buckey 3H | 21-14N-4W | Carroll | OH | 3401922074 |
| 833530 | Burgett 7-15-6 8H RS | 7-15N-6W | Carroll | OH | 3401922085 |
| 833017 | Calvin Mangun 8H | 22-15N-5W | Carroll | OH | 3401922073 |
| 833516 | Coniglio 7-14-4 6H | 7-14N-4W | Carroll | OH | 3401922084 |
| 833130 | Harvey 8H | 16-14N-5W | Carroll | OH | 3401922076 |
| 833129 | Neider 2H | 10-14N-5W | Carroll | OH | 3401922075 |
| 833486 | Shaw 20-14-5 5H | 20-14N-5W | Carroll | OH | 3401922081 |
| 833867 | Tanner 24-12-4 10H | 23-12N-4W | Carroll | OH | 3401922090 |
| 833490 | West 4-15-5 3H | 4-15N-5W | Carroll | OH | 3401922082 |
| 833353 | White 17-13-5 8H | 17-13N-5W | Carroll | OH | 3401922088 |

STATE OF OHIO. CARROLL COUNTY) ss:
I, PATRICIA J. DYER, Recorder in and for the county of
[illegible handwritten/stamped text]
[illegible] HEREOF A
[illegible]
___ 107 A ___ January __ 19 __
PATRICIA J. DYER (RECORDER)
DEPUTY
[signature]

Instrument                Book Page
201200003777 OR           82 2502

201200003777 [handwritten]
Filed For Record in
CARROLL COUNTY, OHIO
PATRICIA J. DYER, RECORDER
05-04-2012 At 10:50 am.
ASSIGN LEAS     19780.00
OR Book      82 Page 2502 - 2834√

4331

## ASSIGNMENT, BILL OF SALE AND CONVEYANCE

STATE OF OHIO              §
                          §
COUNTY OF CARROLL         §

THIS ASSIGNMENT, BILL OF SALE AND CONVEYANCE (this "Assignment"), dated effective as of November 1, 2011 at 7:00 a.m. Central Time (the "Effective Time"), is made by CHESAPEAKE EXPLORATION, L.L.C., an Oklahoma limited liability company, with a notice address of 6100 North Western Avenue, Oklahoma City, Oklahoma 73118 ("Assignor"), to TOTAL E&P USA, INC., a Delaware corporation, with a notice address of 1201 Louisiana, Suite 1800, Houston, Texas 77002 ("Assignee"). This Assignment is executed and delivered in connection with and pursuant to the terms of that certain Purchase and Sale Agreement dated December 30, 2011 (the "Agreement"), by and among Assignor, EnerVest Energy Institutional Fund IX, L.P., EnerVest Energy Institutional Fund IX-WI, L.P., EnerVest Energy Institutional Fund XI-A, L.P., EnerVest Energy Institutional Fund XI-WI, L.P., CGAS Properties, L.P., Belden and Blake Corporation, and Assignee.

1.    Assignment.  For and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby GRANT, BARGAIN, SELL, CONVEY, ASSIGN, TRANSFER, SET OVER AND DELIVER unto Assignee, the Assignee's Proportionate Share (as hereinafter defined) of all of Assignor's (including the right, title and interest of Chesapeake AEC Acquisition, L.L.C. and Ohio Buckeye Energy, L.L.C., each of whom has been merged into Assignor) and its Affiliates' right, title and interest as of the Effective Time (or, with respect to the Contract PSA Leases, as of December 30, 2011 (the "Closing Date")) in and to the following in the Utica Area (but excluding Assignor's Excluded Assets) subject to the terms and reservations hereof:

1.1    All oil, gas and mineral leases, leasehold interests, operating rights, working interests and net revenue interests, and other rights to crude oil, natural gas, casinghead gas, condensate, sulfur, natural gas liquids, and other gaseous hydrocarbons (collectively, "Hydrocarbons"), including those interests and rights described in Exhibit "A" attached hereto and made a part hereof, which are owned by (i) Assignor (including the right, title and interest of Chesapeake AEC Acquisition, L.L.C. and Ohio Buckeye Energy, L.L.C., each of whom has been merged into Assignor) or any of its Affiliates as of the Effective Time or (ii) Assignor (including the right, title and interest of Chesapeake AEC Acquisition, L.L.C. and Ohio Buckeye Energy, L.L.C., each of whom has been merged into Assignor) or any of its Affiliates with respect to the Contracted PSA Leases as of the Closing Date, in each case, whether producing or non-producing; and the lands covered by the leases and interests, including those described in Exhibit "A" even though such rights might be omitted from or incorrectly described on Exhibit "A" (collectively, the "Lands");

Instrument     Book Page
201200003777 OR    82 2503

1.2    (i) All of the oil and gas wells listed in Exhibit "A" (the "Wells"), (ii) all Lease Owned well heads, casing, tubing, pumps, motors, gauges, valves, heaters and treaters constituting part of or connected to the Wells or located on the PSA Leases, (iii) Lease Owned automation equipment constituting part of or connected to the Wells or located on the PSA Leases, (iv) all Lease Owned gathering lines and improvements, water lines, vessels, tanks, boilers, separators, treating equipment, compressors and other equipment used in connection with the Wells or PSA Leases, (v) all Lease Owned power lines, telephone and communication lines used in connection with the Wells or PSA Leases, (vi) all Lease Owned injection wells and water disposal facilities, and (vii) all other Lease Owned appurtenances owned and used in connection with the production, treating, storing, transportation or marketing of Hydrocarbons from the Wells or PSA Leases (the property described in subsections (ii) through (vii) of this subpart 1.2 being collectively, the "Equipment");

1.3    All presently existing unitization, pooling and/or communitization agreements, declarations or designations and contractually, statutorily, judicially or administratively created drilling, spacing and/or production units, insofar as the same are attributable or allocated to the Lands, and all of Assignor's and its Affiliates' interest in and to the properties covered or units created thereby (collectively, "Unitization Acreage");

1.4    All presently existing and valid Hydrocarbon sales agreements, operating agreements (excluding any operating rights or duties), gathering agreements, transportation agreements, farmout and farmin agreements, unitization, pooling and communitization agreements, purchase agreements, exploration agreements, area of mutual interest agreements, exchange and processing contracts and agreements and any other contracts, agreements and instruments insofar as the above agreements cover, are attributable to or relate to the Lands or the Wells or any interests pooled, communitized or unitized therewith, including those contracts and agreements described on Exhibit "C-1" attached to the Agreement (collectively, the "Contracts");

1.5    All Hydrocarbons in, on, under or produced from or attributable to the Lands or the Unitization Acreage from and after the Effective Time and the proceeds thereof and inventory purchased from Assignor or its Affiliates pursuant to Section 2.5(a) of the Agreement;

1.6    All easements, surface leases, servitudes, rights of way and all other rights and appurtenances situated on or used in connection with the production of Hydrocarbons from the Lands or the Unitization Acreage, including leases, easements or rights-of-way with respect to surface fee interests included in Assignor's Excluded Assets and (i) used or held for use for the location of or access to Wells or Equipment or (ii) necessary for the development or operation of any of the Properties (collectively, the "Easements");

1.7    Subject to the rights and restrictions of Third Parties, copies of Assignor's books, records and files, including all Contracts and any and all title files, lease files, land files, wells files, including Geological and Geophysical Information which is not an Excluded Asset of Assignor and which is not covered by the Seismic License delivered by Assignor to Assignee on the Closing Date, well logs and other well data, maps, division order files, abstracts, production files, technical, engineering and maintenance files, environmental and safety records and information to the extent related to the items listed in subparts 1.1 through 1.6 hereof, and, to the extent available, in an industry standard or already existing electronic format as reasonably requested by Assignee, excluding, except to the extent of current ad valorem and severance Tax returns, accounting and tax records for all periods prior to the Effective Time; and

1.8    Rights and interests in proceeds under any policy or agreement of insurance or rights and interests under any agreement of indemnity (including any rights, claims or causes of action of Assignor or its Affiliates against Third Parties under any indemnities or hold harmless agreements and any indemnities received in connection with Assignor's or its Affiliates' prior acquisition of any of the Properties) to the extent and only to the extent such rights and interests relate to losses, damages, claims, liabilities, debts, obligations or expenses that are Assumed Obligations under the Agreement.

00174

All rights, titles and interests transferred and assigned to Assignee pursuant to this Section 1 being collectively called the "Conveyed Interests". It is the intent of Assignor to convey and this Assignment hereby conveys to Assignee, subject to the reservations and conditions herein contained, the Conveyed Interests, regardless of errors in description, any incorrect or misspelled names, or any transcribed or incorrect recording references. As used in this Assignment, the term "Assignee's Proportionate Share" shall mean an undivided 89.2857%.

TO HAVE AND TO HOLD all and singular the Conveyed Interests together with all rights, titles interests, estates, remedies, powers, and privileges thereunto appertaining unto Assignee and Assignee's successors and assigns forever.

2.    Development Agreement.  The Conveyed interests are subject to the Development Agreement.

3.    Special Warranty of Defensible Title. Assignor does hereby bind itself and its successors and assigns to warrant and forever defend all and singular Defensible Title to the Conveyed Interests unto Assignee and Assignee's successors and assigns, against every Person whomsoever lawfully claiming or to claim the same or any part thereof, by, through, or under Assignor, but not otherwise. This special warranty of Defensible Title will continue after the delivery of this Assignment for a period of five (5) years and shall thereafter be of no further force or effect except with respect to any claim under such special warranty of Defensible Title that has been asserted prior to the end of such five (5) year period, which shall survive until such claim with respect thereto is resolved. The intended effect of such termination is to bar, from and after the date of termination, any claim or cause of action with respect to such special warranty of Defensible Title. Further, Assignee is specifically assigned, and subrogated to, the rights or actions on title warranties given or made by Assignor's or its Affiliate's predecessors in title, with respect to the Conveyed Interests and to the extent Assignor may legally assign such rights and grant such subrogation.

4.    Special Retained Liabilities.  Reference is hereby made to that certain (i) Amended and Restated Royalty Agreement dated as of December 1, 2011, by and among Assignor, CHK Utica, L.L.C. ("CHK Utica"), Chesapeake Appalachia L.L.C., Chesapeake AEC Acquisition, L.L.C., Ohio Buckeye Energy, L.L.C. (collectively, the "Chesapeake Parties") and Utica Royalty Partners, LP (the "Royalty Company I") and (ii) Royalty Agreement dated as of December 1, 2011, by and among the Chesapeake Parties and Utica Royalty Partners II LP ("Royalty Company II" and such agreements collectively, the "Royalty Agreements"). Assignor does hereby acknowledge and agree that the Conveyed Interests shall not be burdened by the Royalty Agreements or any overriding royalty interests or other rights granted to the Royalty Company I or Royalty Company II pursuant thereto, including, without limitation, the overriding royalty interests and other rights assigned pursuant to the Conveyances of Overriding Royalty Interest described in Exhibit "B" attached hereto (collectively, the "Special Retained Liabilities"), and that such interests and rights shall exclusively burden and be carved out of Assignor's rights, titles and interests in the Properties that do not constitute Conveyed Interests. Furthermore, Assignor does hereby agree to pay, defend, indemnify, reimburse and hold harmless Assignee for, from and against any loss, damage, diminution in value, claim, liability, debt, obligation or expense (including interest, reasonable legal fees, and expenses of litigation and attorneys fees in enforcing this indemnity) incurred, suffered, paid by or resulting to Assignee and which result from, arise out of or in connection with, is based upon, or exist by reason of, any claims made against Assignee pursuant to or on account of the Royalty Agreements or the Special Retained Liabilities.

Case: 5:12-cv-01736-JRA  Doc #: 27  Filed: 03/08/13  176 of 182.  PageID #: 414

Instrument                Book Page
201 200002777  OR          B2 2505

5.    Limitations on Representations and Warranties.

5.1    EXCEPT FOR THE EXPRESS AND SPECIFIC REPRESENTATIONS
AND WARRANTIES OF ASSIGNOR IN THE AGREEMENT AND ASSIGNOR'S
CERTIFICATE DELIVERED AT CLOSING PURSUANT THERETO AND EXCEPT
FOR THE SPECIAL WARRANTY OF DEFENSIBLE TITLE CONTAINED IN THIS
ASSIGNMENT, ASSIGNEE ACKNOWLEDGES THAT ASSIGNOR HAS NOT MADE,
AND ASSIGNOR HEREBY EXPRESSLY DISCLAIMS AND NEGATES, AND
ASSIGNEE HEREBY EXPRESSLY WAIVES, ANY REPRESENTATION OR
WARRANTY, EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE OR
OTHERWISE RELATING TO (i) PRODUCTION RATES, RECOMPLETION
OPPORTUNITIES, DECLINE RATES, GAS BALANCING INFORMATION, OR THE
QUALITY, QUANTITY OR VOLUME OR THE RESERVES OF HYDROCARBONS, IF
ANY, ATTRIBUTABLE TO THE PROPERTIES, (ii) THE ACCURACY,
COMPLETENESS OR MATERIALITY OF ANY RECORDS, INFORMATION, DATA
OR OTHER MATERIALS (WRITTEN OR ORAL) NOW, HERETOFORE OR
HEREAFTER FURNISHED TO ASSIGNEE BY OR ON BEHALF OF ASSIGNOR, AND
(iii) THE ENVIRONMENTAL CONDITION OF THE PROPERTIES.

5.2    EXCEPT FOR THE EXPRESS REPRESENTATIONS AND
WARRANTIES OF ASSIGNOR IN THE AGREEMENT AND ASSIGNOR'S
CERTIFICATE DELIVERED AT CLOSING PURSUANT THERETO AND EXCEPT
FOR THE SPECIAL WARRANTY OF DEFENSIBLE TITLE CONTAINED IN THIS
ASSIGNMENT, AND WITHOUT LIMITING THE GENERALITY OF THE
FOREGOING, ASSIGNOR EXPRESSLY DISCLAIMS AND NEGATES, AND
ASSIGNEE HEREBY WAIVES, AS TO PERSONAL PROPERTY, EQUIPMENT,
INVENTORY, MACHINERY AND FIXTURES CONSTITUTING A PART OF THE
PROPERTIES, (i) ANY IMPLIED OR EXPRESS WARRANTY OF
MERCHANTABILITY, (ii) ANY IMPLIED OR EXPRESS WARRANTY OF FITNESS
FOR A PARTICULAR PURPOSE, (iii) ANY IMPLIED OR EXPRESS WARRANTY OF
CONFORMITY TO MODELS OR SAMPLES OF MATERIALS, (iv) ANY RIGHTS OF
PURCHASERS UNDER APPROPRIATE STATUTES TO CLAIM DIMINUTION OF
CONSIDERATION OR RETURN OF THE PURCHASE PRICE, (v) ANY IMPLIED OR
EXPRESS WARRANTY OF FREEDOM FROM DEFECTS, WHETHER KNOWN OR
UNKNOWN, (vi) ANY AND ALL IMPLIED WARRANTIES EXISTING UNDER
APPLICABLE LAW, AND (vii) ANY IMPLIED OR EXPRESS WARRANTY
REGARDING ENVIRONMENTAL LAWS, THE RELEASE OF SUBSTANCES,
WASTES OR MATERIALS INTO THE ENVIRONMENT, OR PROTECTION OF THE
ENVIRONMENT OR HEALTH, IT BEING THE EXPRESS INTENTION OF
ASSIGNEE AND ASSIGNOR THAT THE PERSONAL PROPERTY, EQUIPMENT,
INVENTORY, MACHINERY AND FIXTURES IN WHICH ASSIGNOR HAS ANY
INTEREST ARE BEING ACCEPTED BY ASSIGNEE, SUBJECT TO THE TERMS OF
THE AGREEMENT, "AS IS, WHERE IS, WITH ALL FAULTS" AND IN THEIR
PRESENT CONDITION AND STATE OF REPAIR.

5.3    ASSIGNOR AND ASSIGNEE AGREE THAT, TO THE EXTENT
REQUIRED BY APPLICABLE LAW TO BE EFFECTIVE, THE DISCLAIMERS OF
CERTAIN WARRANTIES CONTAINED IN THIS SECTION 5 ARE "CONSPICUOUS"
DISCLAIMERS FOR THE PURPOSES OF ANY APPLICABLE LAW, RULE OR
ORDER.

6.    Miscellaneous

6.1.    Cooperation. In addition to this Assignment, Assignor shall execute,
acknowledge, and deliver to Assignee, in a timely manner and without further consideration, any
documents or instruments that Assignee may reasonably require, including, without limitation,
further assignments or conveyances required by any state or federal authority, deeds, and
consents to further evidence the assignment and conveyance of the Conveyed Interests by
Assignor to Assignee.

00176

6.2. Counterparts. This Assignment may be executed in multiple counterparts, each of which will be an original instrument, but all of which will constitute one instrument; provided, however, that to facilitate recording or filing of this Assignment, each recorded or filed counterpart may contain only a portion of Exhibit "A" as provided in Section 6.4 of this Assignment.

6.3. Successors and Assigns. This Assignment shall bind and inure to the benefit of Assignor and Assignee and their respective successors and assigns.

6.4. Recording of Assignment. To facilitate recording or filing of this Assignment, the counterpart filed with a county agency or office may contain only that portion of Exhibit "A" that describes property under the jurisdiction of that agency or office. Assignor, on the one hand, and Assignee, on the other hand, have each retained a counterpart of this Assignment containing a full description of all of the Conveyed Interests.

6.5. Capitalized Terms. Except as otherwise defined herein, all capitalized terms used in this Assignment which are defined in the Agreement will have the same meanings herein as defined in the Agreement; *provided, however, that*, notwithstanding any provision of this Assignment, CHK Utica will not be considered an "Affiliate" of the Assignor for purposes of this Assignment.

6.6. Conflicts. If there is a conflict between the provisions of the Agreement and this Assignment, the provisions of the Agreement shall control.

6.7. Choice of Law. THIS ASSIGNMENT AND THE LEGAL RELATIONS AMONG THE PARTIES SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF OHIO.

6.8. Arbitration. Any disputes, claims, counterclaims, demands, causes of action, controversies and other matters in question between the parties hereto arising out of or relating to this Assignment or the alleged breach hereof, regardless of whether (a) allegedly extra-contractual in nature, (b) sounding in contract, tort or otherwise, (c) provided for by Law or otherwise, or (d) seeking damages or any other relief, whether at Law, in equity or otherwise, shall be resolved through final and binding arbitration in accordance with Section 13 of the Agreement, the terms of which are incorporated by reference as if set out in full herein.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, each of Assignor and Assignee has executed this instrument on the date of its respective acknowledgment annexed hereto, but effective for all purposes as of the Effective Time.

ASSIGNOR:

CHESAPEAKE EXPLORATION, L.L.C.,
an Oklahoma limited liability company

By: _____
Douglas J. Jacobson
Executive Vice President

ASSIGNEE:

TOTAL E&P USA, INC.,
a Delaware corporation

By: _____
Fabien Cousin-Sarge
Vice President Business Development & Strategy

This instrument was prepared by:

Jeremy A. Mouton
Commercial Law Group, P.C.
5520 North Francis Avenue
Oklahoma City, OK 73118

First Amount
2012000?0777 DR     Book Page
82 2509

## ASSIGNEE ACKNOWLEDGMENT

STATE OF OKLAHOMA        §
                        §
COUNTY OF OKLAHOMA       §

This instrument was acknowledged before me on this 30th day of December, 2011, by Fabien Colmet Daage, as Vice President Business Development & Strategy of Total E&P USA, Inc., a Delaware corporation, as the act and deed and on behalf of such corporation.

Notary Public

My Commission expires: 6-11-15
Commission Number: 03008905

LINN D. YOUSEY
NOTARY
# 03008905
EXP. 06/11/15
PUBLIC
STATE OF OKLAHOMA

00179

Case: 5:12-cv-01736-JRA Doc #: 27 Filed: 03/08/13 180 of 182. PageID #: 418

Instrument 20170 003777 OR — Book Page 82 2695

EXHIBIT "A"

Attached to and made a part of that certain Assignment, Bill of Sale and Conveyance dated effective November 1, 2011 from Chesapeake Exploration, L.L.C., as Assignor to Total E&P USA, Inc., as Assignee

| Lease No | Lessor | Lessee | Lease Date | Township | County | State | Book | Page | Entry |
|---|---|---|---|---|---|---|---|---|---|
| 34-000066-000 | GORDON V ISENHOUR AND PATRICIA R ISENHOUR, HUSBAND AND WIFE | KENYON ENERGY LLC | 7/27/2010 | FOX | CARROLL | OH | 82 | 150 | 201000002692 |
| 34-000075-000 | ROBERT A. MOSER | KENYON ENERGY, LLC | 5/14/2010 | AUGUSTA | CARROLL | OH | 80 | 1511 | 201000001863 |
| 34-000082-000 | RONALD P PERDUE AND HELEN E. PERDUE, HUSBAND AND WIFE | KENYON ENERGY, LLC | 8/15/2010 | WASHINGTON | CARROLL | OH | 61 | 959 | 201000002391 |
| 34-000086-000 | RICHARD POWELL, A WIDOWER | KENYON ENERGY, LLC | 7/22/2010 | CENTER | CARROLL | OH | 61 | 2348 | 201000002696 |
| 34-000087-000 | REPELLA INVESTMENTS, LLC | KENYON ENERGY, LLC | 5/14/2010 | UNION | CARROLL | OH | 60 | 1619 | 201000001895 |
| 34-000101-000 | HOWARD W SPAHR AND DONNA L SPAHR, HUSBAND AND WIFE | KENYON ENERGY LLC | 7/29/2010 | CENTER | CARROLL | OH | 81 | 2604 | 201000002760 |
| 34-000105-000 | THEODORE R. SUMMER, JR. AND KAZUKO SUMMER, HUSBAND AND WIFE AND TRUSTEES OF THE SUMMER FAMILY REVOCABLE LIVING TRUST | KENYON ENERGY, LLC | 7/28/2010 | WASHINGTON | CARROLL | OH | 61 | 2364 | 201000002701 |
| 34-000117-000 | LEONARD A. LATTIN AND VERONICA S. LATTIN, HUSBAND AND WIFE | KENYON ENERGY, LLC | 7/14/2010 | PERRY | CARROLL | OH | 61 | 2353 | 201000002699 |
| 34-000119-000 | RICHARD I. TOALSTON AND LAURA TOALSTON, HUSBAND AND WIFE | KENYON ENERGY, LLC | 6/9/2010 | EAST | CARROLL | OH | 61 | 578 | 201000002313 |
| 34-000124-000 | LONNIE D. LUCAS AND JENNIFER A. LUCAS, HUSBAND AND WIFE | KENYON ENERGY LLC | 7/14/2010 | CENTER | CARROLL | OH | 61 | 2359 | 201000002700 |
| 34-000126-000 | MARK R. FRITZ AND MICHELLE E. FRITZ, HUSBAND AND WIFE | KENYON ENERGY LLC | 7/27/2010 | AUGUSTA | CARROLL | OH | 62 | 176 | 201000002896 |
| 34-000127-000 | FRITZ DAIRY FARMS, LLC | KENYON ENERGY, LLC | 7/27/2010 | AUGUSTA WASHINGTON | CARROLL | OH | 62 | 163 | 201000002894 |
| 34-000131-000 | WARREN H. WEFLER, A SINGLE MAN | KENYON ENERGY, LLC | 5/17/2010 | AUGUSTA | CARROLL | OH | 60 | 1515 | 201000001894 |

IT IS THE INTENTION OF THE ASSIGNOR TO CONVEY THE LEASES INSOFAR AND ONLY INSOFAR AS THE LEASE IS LOCATED WITHIN THE DESCRIBED "OWNS" BP.

# INDEX 9

## DOC #27   1-2-2013   LEIBY'S DRAFT
## CONFIDENTIALITY SETTLEMENT DOCUMENT

## CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release (the "Agreement") is entered into by and between Fritz Dairy Farms, LLC, Mark R. Fritz and Michele E. Fritz (collectively "Fritz Parties") and Chesapeake Exploration, L.L.C., Richard Owen, and Kenyon Energy, LLC (collectively "Chesapeake Parties"), all of whom are collectively referred to as the "Parties" and each of whom is individually referred to as a "Party," as of this _____ day of January, 2013.

**WHEREAS**, the Fritz Parties entered into Paid Up Oil & Gas Leases with Kenyon Energy, LLC made and effective on July 27, 2010 (the "Leases"); and

**WHEREAS**, disputes and claims arose between the Parties relating to the Leases, including claims that are the subject of the Fritz Parties complaint filed in the Court of Common Pleas of Carroll County Ohio under Case No. 12 CVH 27 184, which was ultimately removed to the United States District Court for the Northern District of Ohio, Eastern Division, under Case 5:12-cv-01736 (the "Lawsuit"); and,

**WHEREAS**, the Fritz Parties asserted in the Lawsuit that, among other things, the Leases as recorded were altered after they signed them (the "Recorded Leases"); and,

**WHEREAS**, the Parties, without admitting to any liability to each other, have agreed to settle and compromise all claims with each other relating or arising out of the Leases and the Recorded Leases;

**NOW, THEREFORE**, in consideration of the promises and covenants contained herein, and other good and valuable consideration, the sufficiency of which is acknowledged, and intended to be legally binding, it is agreed by and among the Parties as follows:

1.    The Chesapeake Parties agree to pay the sum of Ten Thousand And 00/100 Dollars ($10,000.00) to the Fritz Parties upon the latter's execution and recording of amendments to the Recorded Leases containing essentially the terms specified in Section 2 below.

2.    The Recorded Leases, and each of them, shall be amended to provide essentially that:

A.    The section titled LEASE TERM shall be amended to read "This Lease shall remain in force for a primary term of Seven (7) years from 12:00 A.M. July 27, 2010 (effective date) to 11:29 P.M. July 26, 2017 (last day of primary term) ..."

B.    The section titled EXTENSION OF PRIMARY TERM shall be deleted.

C.    The section titled DISPOSAL AND INJECTION WELLS shall be amended:

(1)    Beginning on the third line to read "the Leasehold or lands pooled or unitized therewith for the disposal and/or injection into any subsurface strata, below those providing water from Lessor's wells, of air, gas, brine ..."

-1-

(2)    By adding thereto the following language: "Lessee shall do nothing to interfere with and shall immediately, fully and properly repair any damage to waterlines leading from Lessor's water wells and fully and completely rectify any contamination and the results of any contamination resulting from such damage."

(3)    By adding thereto the following language: "Lessee shall, and shall require its subcontractors to, store, treat and transport all products and by-products used in or extracted by or as a result of any of its activities in a safe manner such that Lessor's lands, water, crops, and livestock shall not be damaged in any manner. In the event Lessee's actions or those of its subcontractors result in any damage to Lessor's lands, water, crops, or livestock, Lessee shall immediately, fully and properly repair any such damage and restore Lessor's lands, water, crops or livestock as nearly as possible to their original condition."

(4)    By adding thereto the following language: "Lessee shall not use for any purpose any well water, pools, or the water table on and under Lessor's lands."

D.    A new section shall be added which shall read "As soon as is reasonably possible, following completion of Lessee's operations or the expiration or other termination of this Lease, whichever shall soonest occur, Lessee shall restore the Leasehold, as nearly as possible, to its original condition and land contour."

3.    The Parties shall pay their own costs, expenses, and legal fees in connection with the Lawsuit and its settlement and dismissal.

4.    In consideration of the promises and covenants set forth in this Agreement and for other good and valuable consideration, the sufficiency of which is hereby acknowledged the Parties, for and on behalf of themselves, their partners, shareholders, attorneys, spouses, family members, officers, employees, agents, members, owners, representatives, affiliates, subsidiaries, and their respective successors and assigns, release, acquit and forever discharge each other of and from any and all claims, actions, expenses and compensation whatsoever which the Parties now have or which may hereafter accrue on account of or in any way growing out of any and all known and unknown, foreseen and unforeseen injuries and/or damages resulting from the Recorded Leases, including all issues raised in the Lawsuit or which could have been raised in the Lawsuit, and with respect to the foregoing, except for the terms of the Recorded Leases amended as above provided and except to enforce the terms of this Agreement.

5.    All matters relating to the terms and negotiation of this Agreement shall be and remain strictly confidential between the Parties hereto, except the terms contained in Section 2 above and except that this Agreement, by its terms, may be disclosed as follows: (a) to the Parties' auditors, accountants, attorneys, lenders, insurers and financial advisors; (b) to enforce the terms of this Agreement; (c) if disclosure is required by contract, court order, or operation of law; or (d) by mutual written agreement of all the Parties. To the extent any other person or entity seeks to compel disclosure of this Agreement by any Party, such Party from whom disclosure is sought shall notify the other Parties of such efforts and shall reasonably cooperate in the other Parties' efforts, at the other Parties' sole cost

-2-

and expense, to prevent disclosure or to maintain this Agreement and its terms under seal or protective order.

6.      Each of the Parties to this Agreement hereby warrants and represents that this Agreement constitutes the entire agreement of the Parties, that no promises or inducements have been offered except as set forth in this Agreement, and that this Agreement is executed without reliance upon any statement or representation by any of the other Parties to this Agreement or any of their respective representatives or attorneys concerning the nature and extent of any claims, damages or legal liability.

7.      Each of the Parties to this Agreement warrants and represents that the individual executing this Agreement on its behalf (A) fully understands this Agreement; (B) is authorized to execute this Agreement on behalf of its respective principal; (C) has carefully read and reviewed this Agreement; and (D) is voluntarily entering into this Agreement.

8.      This Agreement shall be binding upon and inure to the benefit of the Parties and their respective agents, employees, servants, successors, heirs, executors, administrators, members, partners, officers, directors, firms, corporations, associations or partnerships associated therewith, and any corporation, partnership, company, or other entity into which any Party may merge, consolidate, or reorganize.

9.      This Agreement has been, and shall for all purposes be deemed to have been, executed and delivered within the state of Ohio, and it shall be construed and enforced in accordance with and be governed by the laws of the state of Ohio.

10.     The Parties acknowledge and represent that this Agreement evidences the settlement of disputed claims, and that the consideration for such shall not be construed as an admission of liability by either party, as the same is and always has been expressly denied.

11.     This Agreement is the entire agreement between the Parties with respect to the subject matter. It supersedes all prior and contemporaneous oral and written agreements and discussions. It may be amended, supplemented or modified only by an agreement in writing and signed by all Parties.

12.     If any term of this Agreement is for any reason invalid or unforeseeable, the rest of the Agreement remains fully valid and enforceable. No waiver of any term of this Agreement constitutes a waiver of any other provision, whether similar or dissimilar. No waiver of any term constitutes a continuing waiver of that term. No waiver is binding unless signed in writing by the waiving party.

13.     Each Party has cooperated in, and in any construction of this Agreement shall be deemed to have cooperated in, the drafting and preparation of this Agreement.

14.     This Agreement may be executed in counterparts, each of which is considered an original, but all of which constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have voluntarily executed this Confidential Settlement Agreement and Release.

-3-

Fritz Dairy Farms, LLC

Date: _____, 2013    By: _____
                                      Name: _____
                                      Title: _____

Date: _____, 2013    _____
                                      Mark R. Fritz

Date: _____, 2013    _____
                                      Michele E. Fritz

Chesapeake Exploration, L.L.C.

Date: _____, 2013    By: _____
                                      Name: _____
                                      Title: _____

Date: _____, 2013    _____
                                      Richard Owen

Kenyon Energy, LLC

Date: _____, 2008    By: _____
                                      Name: _____
                                      Title: _____

-4-

00146

# INDEX 10

## "PLAINTIFFS' EXHIBIT 1"

| | |
|---|---|
| **Subject:** | [No Subject] |
| **From:** | Stephen P. Leiby (sleiby@neolaw.biz) |
| **To:** | mmfritz@yahoo.com; |
| **Cc:** | shobson@neolaw.biz; |
| **Date:** | Monday, December 17, 2012 8:48 PM |

**NOTE: THE INFORMATION CONTAINED IN THIS E-MAIL IS PRIVILEGED AND CONFIDENTIAL AND SOLELY FOR THE USE OF THE INTENDED RECIPIENT. IF YOU ARE NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY REVIEW, DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS E-MAIL IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS E-MAIL BY MISTAKE, IMMEDIATELY DELETE IT AND ALL COPIES AND SEND A REPLY OR CALL 330-253-2227 (YOU MAY CALL COLLECT) TO NOTIFY THE SENDER OF THE MISTAKEN TRANSMISSION.**

Mrs. Fritz,

There is one item regarding the settlement which I failed to mention. After I confirmed the settlement with you, the judge wanted to meet with the attorneys to have the settlement read into the record. One of the items that the defendants required is a confidentiality provision, meaning that you cannot discuss the settlement with anyone. As a practical matter, that means you cannot discuss the $10,000 payment with anyone because the other three items (lease term shortened to a total of 7 ½ years, water protection, and reclamation) will be a matter of public record. If you have already mentioned the $10,000 to anyone, please advise them they may not mention it to anyone else. As to the rest, in order to avoid jeopardizing the settlement it would be wise to say nothing to anyone until the settlement agreement and the lease revision are signed and the latter filed.

STEPHEN P. LEIBY

LEIBY HANNA RASNICK

Towne, Evanchan, Palmisano & Hobson, LLC

388 South Main Street, Suite 402

Akron, Ohio 44311

TEL: 330-253-2227

FAX: 330-253-1261